Edward J. Barrett, Trustee, Appellee, v. Chicago, Milwaukee & St. Paul Railway Company, Appellant.

**RAILROADS: Obscured Crossings—Contributory Negligence.** In determining whether a jury question is presented on the issue of the contributory negligence of a party in going upon a railway crossing, material considerations are:
  1. Whether an approaching train is obscured by intervening objects, and if so, when and at what points.
  2. The right to assume that statutory signals will be given.
  3. The right to assume that the speed of the train will not be unlawful.
  4. Whether, if the speed had been lawful, the party would have passed over the crossing in safety.

**MUNICIPAL CORPORATIONS: Ordinance—Admissibility as Evidence.** Ordinances published in book or pamphlet form, with date of passage and publication, are admissible, even though *unsigned*. If they are void because of the omission of essential steps in passage, the objector must so show. (Sec. 687, Code, 1897.)

**NEGLIGENCE: "Last Clear Chance" Rule—Applicability.** The "last clear chance" rule has no possible application under *undisputed* evidence which shows that, after the injured party was actually discovered, everything possible was done to avoid the injury.

**NEGLIGENCE: "Last Clear Chance"—Actual (?) or Constructive (?) Discovery.** One may not be held negligent *under the doctrine of the last clear chance* until he *actually* discovers the peril of the other party.

**NEGLIGENCE:** Evidence—Instinct of Self-Preservation. On the issue whether deceased, in approaching and going upon a railroad crossing, looked and listened for an approaching train, the jury, in the absence of testimony as to what the deceased did do as to looking or listening, may consider the inference of due care arising from the recognized instinct of self-preservation.

**NEGLIGENCE:** Imputed Negligence—Common Enterprise Plus Right to Control. Negligence of the driver of a vehicle will not be imputed to a person riding with the driver, on the naked showing that the parties were engaged in a ''common'' enterprise. Right to control, or an assumption of right to control, the driver must be made to appear.

**NEGLIGENCE:** Imputed Negligence—Driver and Guest—When Equal Care Required. Principle recognized that a person riding with another as a guest may not, in approaching a place of recognized danger,—e. g., a railway crossing,—wholly abandon himself to the care of the driver, especially when the guest has equal opportunity with the driver to look and listen.

**EVIDENCE:** Res Gestae—Accident at Railway Crossing. Statements of a railway engineer, made within five minutes after an accident, and under circumstances which gave assurance that such statements were natural and spontaneous, constitute part of the *res gestae*, even though such statements are not wholly matters of *fact*.

**WITNESSES:** Cross-Examination—Unauthorized Range. Cross-examination on matters wholly aside the direct examination is not allowable. So held where an engineer was asked if he *knew* of the existence of a speed-limiting ordinance not mentioned on direct.

**EVIDENCE:** Conclusions—Ability to Stop Train. A witness may not be asked whether, if he had been running his train at a legal rate of speed, he could have stopped his train, and prevented the accident.

**RAILROADS:** Evidence—Absence of Flagman. Whether public officials had ever had *negotiations* with the railway officials relative to a flagman at a crossing is wholly immaterial on the issue whether it was negligence not to provide such flagman.

**PARTIES:** Real Party in Interest—Trustees. One who is the legal holder of a claim as trustee, but without any beneficial interest therein, may maintain an action thereon. (Sec. 3459, Code, 1897.)

**EXECUTORS AND ADMINISTRATORS:** Assignment of Claim. Principle recognized that an administrator may, with the approval of the court, make a valid assignment of a claim due the estate.

*Appeal from Tama District Court.—J. W. WILLETT, Judge.*

JANUARY 20, 1920.

SUPPLEMENTAL OPINION, DECEMBER 31, 1920.

AN action for damages consequent on a collision of a train with an automobile, resulted in a verdict for plaintiff and judgment thereon.  The defendant appeals.—*Reversed.*

*Hughes, Sutherland & O'Brien,* for appellant.

*Struble & Stiger,* for appellee.

LADD, J.—An automobile, operated by Lewis Reinig, accompanied by C. J. Berger, was struck by an engine with passenger train, as it passed in an easterly direction over Seigel Street, in the city of Tama, at about 2 o'clock P. M., September 19, 1916. Both occupants of the automobile were killed, one expiring immediately, and the other the following day.  In this action, recovery for damages to the estate of Berger is sought.  The petition alleges that he was without fault, and that the defendant was guilty of negligence: (1) In failing "to give any warning of said train, as required by law, before approaching the crossing;" (2) in operating it at a rate of speed in excess of that permitted by an ordinance of the city of Tama, limiting same to 6 miles per hour; (3) in operating the train at a dangerous rate of speed where the view of its approach was partially obstructed, so that the deceased was prevented from seeing the approaching train; (4) in failing to stop the train after discovering the perilous situation of deceased in time to avoid the collision; and (5) in failing to keep a flagman, or resort to other precaution at the crossing, to warn travelers of the approach of the train.  Appellant challenges the sufficiency of the evidence to carry the issues to the jury, and rulings on the admissibility of evidence, criticises the instructions, and charges that certain remarks in the opening argument were prejudicial to a fair trial.

I.  Was the evidence such as to carry the issue as to whether plaintiff was guilty of contributory negligence to the jury?  The

defendant's railway extends through the city of Tama in an

1. RAILROADS: ob-
scured crossings:
contributory
negligence.

easterly and westerly direction. It is double-tracked, and curves, from a point 195 feet east of the west line of Seigel Street to a point 700 feet west, 2° 30′ to the south. Seigel Street extends north and south over defendant's tracks, and is one of the principal thoroughfares of the city. Fourth Street begins at Seigel Street, and extends to the east. Seigel Street is paved from Fourth Street to and past the double tracks, and on to the house track, about 55 feet north of the main line. The automobile belonged to Reinig, who was at the wheel; and Berger, his father-in-law, was beside him in the front seat. They came in a westerly direction along Fourth Street, and turned into Seigel Street to the north; and, as the car went upon the track, the engine struck the automobile, with the consequences stated. The condition of the car afterwards indicated that it was then moving in high gear; but several witnesses thought it stopped on the track. The evidence tended to show that the automobile was moving at a speed of from 10 to 15 miles an hour. The jury might have found that the speed of the train was from 20 to 35 miles an hour. To aid in understanding the situation, we annex a portion of a map prepared by the engineer of Tama County.

Seigel Street is 66 feet wide, with 31 feet paved, 12 feet 7 inches each side parked, and 5-foot sidewalks. The distance from the north line of Fourth Street, extended so as to cut the west line of Seigel Street, to the south rail of defendant's main line, is 65 feet, and from the south line of Fourth Street so extended, 112 feet. There is a clump of 7 barberry bushes, from 2 to 4 feet high, beginning 38 feet south of the south rail. The valve box noted on the map is only a few inches above the surface. The north side of two large lilac bushes is 52 feet south of this rail. Thirty-six feet south of the rail on the curb line is an electric light pole, and a few feet farther on, a telephone pole. A water crane about 12 feet high is about 6 feet from the south rail. From the lilacs, a row of 18 bushes extends westward to the south side of the water tank, and in that row is a tree. Northeast of the water tank is another tree, about 12 inches in diameter. The center of the water tank is about 68 feet from the center line of the south track. The pump house

is approximately 73 feet from the south rail, and 134 feet from the place of collision. Behind the pump house is a tool shed, which is about the same distance from the south track, and about 25 feet west of the pump house. North of the tool shed are three bushes; and west of the pump house, two large bushes; and a row of bushes extends from that point to a point about 42 feet south of the center line of the south track, and approximately 250 feet west of Seigel Street, thence continuing parallel to the south track for a distance of about 60 feet. South of this row of bushes are three trees and two other bushes. The bushes, other than the barberry, are said to be from 7 to 11 feet high. South of that portion of Fourth Street said to have been vacated, are a house, a carpenter shop, and trees. The evidence disclosed that a person walking or driving westerly on Fourth Street could see the interlocking tower near the crossing of defendant's railway, and that of the Chicago & Northwestern Railway Company, and defendant's railway for some distance to the east. Goodsell fixed the point in Fourth Street from which these could be seen at 110 feet east of Seigel Street, and Burley and McNalley, at 40 feet east thereof. All agree that the open space is about 25 feet wide, a little south of west, and the last-named witness said he could see the track for about 500 feet east of the interlocking plant. Burley testified that ''you don't get much of a view of the crossing,—I should judge about 75 or 100 feet, looking on an angle.'' The engineer, Habenstreit, testified that a straight line from a point in the center of Seigel Street 64 feet south of the south rail, extending immediately north of the lilac bushes, would touch the south rail 220 feet down the track, and that a straight line from a point on the south rail 175 feet west of the center of the crossing, touching the north side of the lilac bushes, would reach the center of Seigel Street 85 feet south of the south rail. This indicates to what extent the lilac bushes might have obstructed the vision of the decedents, as the automobile turned to the north on Seigel Street. The evidence tended to show that there was a tree 110 feet west of Seigel Street, whose branches were not much, if any, higher than the barberry bushes; and Goodsell testified that from the corner of Fourth and Seigel Streets the view would not be obstructed east of a line from the north side of the lilac bushes to this tree. The witness explained:

"The particular tree stands by itself pretty near straight west of the barberry bushes,—a little northwest; but it would be in the same line that the track runs."

Burley testified that, when within 40 or 45 feet from the south rail, one would have an unobstructed view for about 500 feet to the west, and this was confirmed by McNalley. The decedents, then, as they drove along Fourth Street west, might have seen the defendant's railway from the interlocking tower for a considerable distance to the east; and, as they turned north on Seigel Street, they might have seen the railway from the crossing for more than 100 feet west; but the jury might have found that their view was obstructed by the tree located by the engineer as about 110 feet west of Seigel Street, in connection with the barberry bushes, to the point to which the railway might have been seen to the east of the interlocking tower, as decedents drove west on Fourth Street. The train might have passed the line of vision when they looked, if they so did, immediately before turning, or as they turned north on Seigel Street, and had not passed the obstructions to their view, and reached where it could be seen, as it approached the point of collision. Much depends on the speed of the train. The jury might have found that the engine had not then reached a point 200 feet west of the railroad crossing. Had the train been moving so that its speed did not exceed 6 miles an hour, upon reaching the west side of Seigel Street the decedents could have crossed the tracks in safety. They had a right, in approaching the crossing, to assume, if the contrary did not appear, that the employees of the company would give the usual and customary warnings, and would not run at an unlawful rate of speed. *Moore v. Chicago, St. P. & K. C. R. Co.*, 102 Iowa 595; *Case v. Chicago G. W. R. Co.*, 147 Iowa 747; *Wolfe v. Chicago G. W. R. Co.*, 166 Iowa 506; *Merchants T. & S. Co. v. Chicago, R. I. & P. R. Co.*, 170 Iowa 378; *Wilson v. Chicago, M. & St. P. R. Co.*, 161 Iowa 191. It was for the jury to say, then, whether the decedents acted as ordinarily prudent men would have acted, under like circumstances, in concluding, if they so did, in turning up Seigel Street, that they could cross the track in safety before the train would reach the crossing. Whether, notwithstanding that the track might have been clear to a distance of over 100 feet to the

west, they were required to look again for an approaching train, was an issue for the jury to determine. That body might also have concluded that, if the train had been coming at the rate of speed exacted by the ordinance, the decedents would have passed over the track in safety. We are of opinion that the issue as to whether Berger was· in exercise of ordinary care was for the jury to determine.

II. To sustain the allegation of the petition that the train was moving at a speed exceeding that fixed in the city ordinances, plaintiff offered in evidence Section 15 of Ordinance No.

2. MUNICIPAL COR-PORATIONS: ordinance: admissibility as evidence.

14, as the same appeared in the ''Revised Ordinances of 1898'' of the city of Tama. This was objected to, for that, as is said, it contained no date, was unsigned and unauthenticated. Ordinance No. 14 appears to have been passed and published August 7 and August 10, 1893, and, with amendments, is said to have been included among the compiled ordinances. This sufficiently indicated that these were in force at the time the ordinances were compiled. No signatures appear in the so-called ''Revised Ordinances of 1898.'' Section 687 of the Code declares that:

''When any city or town shall cause or has heretofore caused its ordinances to be published in book or pamphlet form, such book or pamphlet shall be received as evidence of the passage and legal publication of such ordinances, as of the dates mentioned or provided for therein, in all courts and places, without further proof. When the ordinances are so published, it shall not be necessary to publish them in the manner provided for in the preceding section.''

The dates appearing, the ordinances are presumed to have been properly adopted and published, as exacted in the section preceding that quoted. Their inclusion in such a book is sufficient authentication, and therefrom it is to be presumed that they had been legally adopted. *Incorporated Town of Hancock v. McCarthy*, 145 Iowa 51. The statute quoted does not contemplate the re-enactment or the republication of the ordinances, but merely their compilation, for convenient use and to simplify the method of their proof. *Gallaher v. City of Jefferson*, 125 Iowa 324, 328; *Rocho v. Boone Electric Co.*, 160 Iowa

94. Defects in the ordinances or in their enactment are not thereby cured. That which may be essential to adoption,—the recording of the vote and of the ordinance, the signatures of the officers, publication, and the like (Section 680 *et seq.* of the Code),— is not a part of the ordinances, but relates to their passage and authentication. All the objections urged by the appellant may be sound, but none were proven; and therefore the prima-facie proof of the ordinance, made out by introducing the "Revised Ordinances of 1898," and the date of the passage of Ordinance No. 14, was not overcome, and it was rightly received in evidence.

III. The evidence was insufficient to carry the issue of last fair chance to the jury. The engineer testified that:

"When I got within, I should judge, a couple of hundred feet, I saw an auto go over this crossing, and when I got up closer to the crossing,—I don't know, 60, 70, or 80 feet,—something like that,—

3. NEGLIGENCE: "last clear chance" rule: applicability.

I couldn't tell you exactly the distances,—I saw another auto approaching the crossing, and I gave the alarm whistle, and at about the same time I applied the air in emergency. * * * I gave the alarm whistle as soon as I saw the automobile that was later struck, and I applied the emergency as soon as I could, and did all I could towards stopping the train after the alarm was given. When I gave the alarm whistle, I was going between 20 and 25 miles an hour, in my best judgment."

Inquiry was made of the witness, on cross-examination, how far he could have seen the crossing and anything approaching it, had he been looking, and also with respect to tests as to how quickly a train might be stopped, though without eliciting information on the latter subject.

"Q. You didn't set your brakes after you sounded the whistle? A. I blew the whistle with my left hand, and before I discontinued blowing the whistle, I pulled the lever around this way, the brake lever, in emergency position, and I was about 25 feet from the car when I lifted the brake into emergency. When I first saw the car, it was right on the crossing,— about 20 feet, I should judge. Q. If you had seen the car before that, you would have put your brakes on before, wouldn't you? (An objection was overruled.) A. Yes. I didn't see the first

car until it went over the crossing, and I didn't see this car until it came up to the crossing,—almost on the crossing when I saw it. I was looking out the front window of the cab, attending strictly to my business. Q. If you had been looking as you should for that dangerous crossing, you would have seen that? A. I was attending strictly to my business, looking out the front cab window. I saw the other car when it passed. I saw this car when it came up to the crossing, probably 10 or 12 feet,—something like that,—maybe 20 feet. Q. There was nothing to prevent you from seeing it for a long way up the track, if you had been looking? A. No, sir. I don't know if I would have seen it, looking straight ahead.''

The fireman was asked:

''Q. Where was the engine at the time that alarm was given, with reference to Seigel Street? A. Just a short distance from it, perhaps 100 feet, 150 feet,—something like that. I had not seen the automobile in which these two men were killed, up to that time. * * * Q. How far do you say that engine was from the crossing, when these blasts were given? A. Well, I don't know,—somewhere around 100 or 125 feet.''

Roach estimated the distance from the crossing at which the alarm was sounded, at 75 feet. The testimony of the engineer that he did everything he could to stop the train when he first saw the decedents' automobile approaching the track, is undisputed, save by Nellie Phillips, who swore that the brakes were not set until the collision occurred. The record is without evidence tending to show within what distance such a train as that in question, moving at the rate it might be found to have been moving, could be stopped, save what actually happened. It is not perceived, then, wherein defendant's employees were negligent in the management of the train, after the perilous position of decedents was discovered by them. According to the evidence, the engineer did all he could, and there was no evidence tending to show that he could have brought the train to a standstill before reaching the automobile, or have slowed it down enough to have enabled the automobile to pass over the track. The issue ought not to have been submitted.

IV. Nor does the instruction under which this issue was

submitted correctly state the law.  In the twenty-fourth paragraph of the charge, the court said that:

**4. NEGLIGENCE:** "last clear chance:" actual (?) or constructive (?) discovery.    "The rule that, where one who, through his own fault, puts himself in a place of danger on a railroad track, is precluded from receiving damages for his resultant injury or death, is subject to the qualification that, where the engineer has, *or by the exercise of ordinary care should have,* discovered the peril of the deceased or his position, and it is apparent that he cannot escape, or he, for any reason, does not make effort to do so, it becomes the duty of the engineer to use all means in his power to avoid injuring the person."

Later in the same instruction, this also appears:

"The general rule that one's own negligence is, in such a case, precluded from recovery, is subject to the qualification that, where the defendant has discovered, *or should have discovered,* the peril of the position of the one killed, and it is apparent that he cannot escape therefrom, or, for any reason, does not make an effort to do so, the duty becomes imperative for the defendant to use all reasonable care to avoid the injury; and, if this is not done, he becomes liable, notwithstanding the negligence of the injured party or deceased."

The italic is ours, and is used to point out the precise error the court fell into.  It is the settled doctrine of this court that, in order to render the employees of a steam railway company negligent under the doctrine of last fair chance, they must have actually seen the persons injured, in such time that, by the exercise of ordinary care, they could have avoided injuring them.  It is not enough that, by the exercise of ordinary care, they must have seen.  It must appear from the evidence that they in fact did see, or knew of their perilous position.  See, among many decisions, *Bourrett v. Chicago & N. R. Co.,* 152 Iowa 579; *Purcell v. Chicago & N. R. Co.,* 117 Iowa 667; *Dieckmann v. Chicago & N. R. Co.,* 163 Iowa 13; *Wilflin v. Des Moines City R. Co.,* 176 Iowa 642, 643.

V.  In the seventeenth instruction, the court told the jury, in substance, that, if none of the witnesses observed whether Berger looked or listened for the approach of the train, then the jury might "consider the instinct of self-preservation, in con-

nection with other facts and circumstances appearing in evidence, in determining whether or not, in that

5. NEGLIGENCE: evidence: instinct of self-preservation.

respect, he exercised ordinary care for his safety, when he came in the zone of danger. But if you believe that, while he was approaching said crossing in said automobile, and during the time the duty devolved upon him to look and listen for approaching trains, he was under the scrutiny of some credible witnesses, who observed the acts and conduct of said C. J. Berger at such time, then you are bound by the evidence given by such witness on such subject, and should not consider the inference that, at the time covered by such testimony, the said C. J. Berger was prompted in his conduct by the instinct of self-preservation, if such inference· is inconsistent with the acts and conduct shown with such direct testimony.'' In the twentieth instruction, the jury was told that:

''If there was no eyewitness who saw or who was observing the movements of decedent, C. J. Berger, at or prior to his looking and listening, there is an inference due to the instinct of the love of life, and the desire of self-preservation, that the decedent was exercising care on his part at that time.''

The jury was then told this inference was not conclusive, and that, in determining whether he did exercise reasonable care in keeping a lookout and listening, all the facts and circumstances in the case bearing thereon should be considered. This is a correct statement of the law, though it might well have been said that there was an eyewitness to what Berger was doing at the time of the collision.

One Roach, who was at work in the carpenter shop, testified that Berger had his ''head turned towards the east,'' when the automobile went upon the railroad crossing. While several witnesses observed the decedents driving the car west on Fourth Street and up Seigel Street towards the crossing, no one pretended to observe what either Berger or Reinig did prior to the collision, save that Reinig was operating the car. No one was able or undertook to say whether either of the decedents looked or listened, or omitted so to do, for the approach of the train. In these circumstances, the inference that decedents exercised the instinct of self-preservation, in approaching the track,

might well be considered, in connection with the other evidence adduced, in ascertaining whether they exercised that vigilance in keeping a lookout and listening which the law requires of everyone in approaching a railroad crossing. *Merchants T. & S. Co. v. Chicago, R. I. & P. R. Co.,* 170 Iowa 378.

VI.  It appears from the evidence that Berger had broken the knuckle to the steering gear of his automobile, the day before the accident, and that Mrs. Berger had telephoned to her daughter, Mrs. Reinig, that this had happened, and that her husband was about to send to Grinnell for repairs.  On the following morning, Mrs. Reinig said to Mrs. Berger, over the telephone, that Reinig would take Berger over to Grinnell in his car, and would come over after him.  Thereupon, Mrs. Berger informed her husband, and told him to get ready.  Shortly thereafter, Reinig came with his automobile, and Berger accompanied him to Grinnell, and it was while returning that the collision occurred.  The court submitted to the jury whether the decedents were engaged in a joint enterprise, such as would render Berger responsible for Reinig's conduct in operating the car; and appellant criticises the court for so doing, by insisting that it conclusively appeared that they were engaged in a joint enterprise, and that the issue ought not to have been submitted. We concur in the contention that the issue was not for the jury, but for the reason that there was no evidence from which the jury might have found that Berger was riding in the automobile otherwise than as a guest, or as a passenger.  Reinig owned the car and operated it, and there was no evidence tending to show that Berger was interested in any manner in its operation or exercise, or had the right to exercise any control over the same.  See *Wagner v. Kloster,* 188 Iowa 174.  Whether or not they were engaged in a joint enterprise, however, was not very important; for Berger, even though a guest, was required, in the exercise of ordinary care for his own protection, to keep a vigilant lookout for approaching trains, when about to pass over the railroad crossing.  He was sitting on the front seat with the driver, and enjoyed opportunities for seeing and listen-

6. NEGLIGENCE: imputed negligence: common enterprise plus right to control.

7. NEGLIGENCE: imputed negligence: driver and guest: when equal care required.

ing equal to those of the driver. There is no reason for exacting a lower degree of care in these respects than Reinig was required to exercise. *Beemer v. Chicago, R. I. & P. R. Co.,* 181 Iowa 642.

VII. Doctor Carpenter was at the place of the collision a few minutes after it occurred, and testified to having a conversation with the engineer, and was permitted, over objection, to testify that the engineer inquired if the men killed lived there, and that he said:

8. EVIDENCE: *res gestae*: accident at railway crossing.

"It is strange that men drive onto tracks without seeing where they are going; I could see them for quite a distance. If they had been looking, they could have seen me, or seen us;" and that he said further that; "if a man stopped his train every time an automobile crossed the track, he would be a long time making a run;" and that "neither one of these men looked up until just before the collision, and the big fellow just looked up;" and also, that he "thought they would be out of his way."

We are of the opinion that the court did not err in receiving this evidence. It was not adduced as impeaching, and, of course, might not have been received as in the nature of admissions binding defendant. *McPherrin v. Jennings,* 66 Iowa 622; *Alquist v. Eagle Iron Works,* 126 Iowa 67. What the engineer said was admissible, as part of the *res gestae.* The conversation occurred almost immediately after the collision, the witness saying, "within five minutes." The engineer, at that time, was at the cab steps, and the train had not started on its way. Scarcely any time within which to premeditate or fabricate had elapsed, and what the engineer is reported to have said seems the natural and spontaneous utterances produced by what had happened, rather than a mere recital. The facts apparently were talking through the party, rather than the party through the facts. *Westcott v. Waterloo, C. F. & N. R. Co.,* 173 Iowa 355; *Alsever v. Minneapolis & St. L. R. Co.,* 115 Iowa 338. A portion of that said was in the nature of a suggestion, but such as was likely, in an exclamation concerning what had occurred, or conditions at the time. There was no error in receiving the evidence.

VIII. The engineer, while on the witness stand, was asked

whether he knew that "there was an ordinance in Tama prohibiting you from running in the limits of Tama, at that point, more than 6 miles an hour." An objection that this was not proper cross-examination was overruled. The ordinance had not been alluded to, directly or indirectly, in the direct examination. The objection should have been sustained.

9. WITNESSES: cross-examination: unauthorized range.

The witness, after stating that his train was moving at 20 or 25 miles an hour, was asked:

"If you had been coming in at the legal rate of speed of 6 miles an hour, you could have controlled and stopped your train before you hit this man, couldn't you?"

10. EVIDENCE: conclusions: ability to stop train.

An objection as incompetent, irrelevant, and immaterial, and not proper cross-examination, calling for an opinion and conclusion, was overruled. The objection should have been sustained. The inquiry called for comparative computations, rather than expert opinion, and on the witness to decide the precise issue which the jury was to pass on.

Nor was this cross-examination of anything brought out in the direct examination. *Butler v. Chicago, B. & Q. R. Co.*, 87 Iowa 206. Cross-examination for the purpose of ascertaining all the facts and circumstances that actually existed, was proper, but it was error to permit cross-examination as to what might have happened, had the facts been different than they actually were. *Russell v. Schade Brewing Co.*, 49 Wash. 362 (95 Pac. 327).

IX. The mayor of Tama was called as a witness, and was asked:

"Did the city of Tama ever have under discussion with the officials of the defendant the matter of putting in a flagman or gates at the crossing which intersects the railway company's line on Seigel Street?"

11. RAILROADS: evidence: absence of flagman.

An objection as incompetent, irrelevant, and immaterial, and not tending to show any negligence on the part of the defendant, was overruled, and the witness answered: "They did." The witness was also asked if he had had any conferences with the officials of the defendant company relative to putting in a

gate or flagman, but the question was not answered. He was then asked: "Has there ever been any gates at this particular crossing?" This question was objected to, as above, and the objection overruled. "A. No." The witness was allowed to state, over objection, that there had been no flagman at the crossing. Whether any negotiations ever occurred could have no bearing whatever on the issue as to whether defendant was negligent in not keeping a flagman at the crossing. The fact that no flagman or gates had been maintained was necessary to prove, in order to show that defendant had omitted to do what, as was claimed, due care required: i. e., maintain a flagman at the time in question.

X. The plaintiff is a resident of Wisconsin, and to him, as trustee, the administratrix of the estate of C. J. Berger, deceased, the guardian of the estate of his only child, and Mrs. Berger, assigned all their right, title, and interest in and to the claim for damages resulting in the death of Berger, in trust as security for the retainer and fees of their attorneys and for the benefit of said assignors, and authorized him to prosecute said claim and distribute the amount recovered among those entitled thereto. This assignment was approved by the court. No consideration was paid therefor. Appellant contends that the trustee may not maintain the action, because not the real party in interest, and relies on Section 3459 of the Code. That statute does exact that:

12. PARTIES: real party in interest: trustees.

"Every action must be prosecuted in the name of the real party in interest; * * * but a trustee of an express trust * * * may sue in his own name, without joining with him the party for whose benefit the action is prosecuted."

Having the legal title, the trustee is the real party in interest. This court has uniformly held, in construing the above section, that the party holding the legal title to a cause of action, though a mere agent or trustee, with no beneficial interest therein, may sue in his own name. *Cassidy v. Woodward*, 77 Iowa 354; *Vimont v. Chicago & N. R. Co.*, 64 Iowa 514; *Oakley v. Goodnow*, 118 U. S. 43 (30 L. Ed. 61). That the administratrix might make such an assignment, appears from *Flynn v. Chicago G. W. R.*

13. EXECUTORS AND ADMINISTRATORS: assignment of claim.

*Co.*, 159 Iowa 571. The court rightly ruled that the trustee might prosecute the action.

Some things appearing in the record will not be likely to occur in another trial, and therefore are given no attention.— *Reversed.*

WEAVER, C. J., EVANS, PRESTON, and SALINGER, JJ., concur.

## SUPPLEMENTAL OPINION

LADD, J.—Appellant's petition for rehearing challenges the conclusion reached in the opinion that the evidence was sufficient to carry the issue as to contributory negligence to the jury, and counsel argue that it is in conflict with *Beemer v. Chicago, R. I. & P. R. Co.*, 181 Iowa 642, where, 90 to 100 feet from the crossing, a view of the railway track 800 to 1,100 feet toward the west could be had, and this increased as the crossing was neared. Neither the driver nor his wife looked, within 40 feet from the track. The speed of the train through the town was limited by ordinance. The facts bring the case within the line of authorities holding that, where the view of an approaching train for 100 or more feet from the crossing is clear, so that, had one looked, he must have seen, and there were no diverting or emergent circumstances, there can be no recovery. See *Williams v. Chicago, M. & St. P. R. Co.*, 139 Iowa 552, where the general rule is clearly stated:

14. RAILROADS: obscured crossings: contributory negligence.

"Nor is it held to be incumbent on the highway traveler to continue to scan the track in either direction at each successive step until the crossing is accomplished; but, on the other hand, he must not forget that he is endowed with senses of sight and hearing, the reasonable use of which is, in a great majority of cases, his sufficient protection against injury of this nature. There are not wanting many cases where the traveler, having once looked for approaching trains when at a suitable distance from a crossing, is held not to be negligent, as a matter of law, because he failed to look again. In these cases, however, we invariably find circumstances reasonably excusing the exercise of such vigilance,—as, for instance, intervening obstructions to

the view, necessary attention to a frightened or nervous team, multiplicity of tracks and moving trains, calculated to confuse or distract the attention, open crossing gates, giving implied assurance of safety, or some fact other than his own forgetfulness or mental abstraction, which might fairly lead a reasonably prudent person to omit such precaution.''

In *Anderson v. Dickinson,* 187 Iowa 572, also relied upon by defendant, the complainant's view was obstructed up to 55 feet from the track, where, notwithstanding denial, the court held that, in the nature of things, the approaching train must have been seen. Numerous other cases so holding are cited. Another case, *Sackett v. Chicago G. W. R. Co.,* 187 Iowa 994, seems to be relied on. There, the plaintiff was riding on the back seat of a motor cycle, with his back in the direction of an approaching train. At the distance of 48 feet from the crossing, he could have seen up the track 208 feet; and, when the train reached the street, the motor cycle was about 60 feet from the point of collision. Neither the driver nor the plaintiff saw it, and the latter at no time looked in the direction from which the train came, though he claimed to have listened. In none of these decisions was the complainant's right to rely on the railroad company's obedience to law involved. The law does not specify precisely what a person about to pass over a railroad crossing must do. The only test to be applied is that, in so doing, he must exercise ordinary care. If the view of the track on which a train is approaching is clear all the way for 100 or more feet to the crossing, from the time it first comes in view, and there are no circumstances excusing the exercise of vigilance, in event of a collision the traveler is held to have been negligent. The trouble is in ascertaining whether there are intervening circumstances, and whether they are sufficient to excuse a more vigilant lookout than was kept.

In *Winey v. Chicago, M. & St. P. R. Co.,* 92 Iowa 622, the court, speaking through Deemer, J., remarked that:

''The rule, no doubt, is that, if the traveler, having looked and listened without seeing or hearing an approaching train within a reasonable distance of the crossing, is, by reason of a neglect of the railroad company to blow the 'statutory' whistle, run upon and injured, liability attaches therefor.''

In *Mackerall v. Omaha & St. L. R. Co.,* 111 Iowa 547, 548, the traveler stopped, looked, and listened, at 100 feet from the crossing. From there to 14 feet from the center of the track was an embankment, obstructing his view, and, in driving down a descent, his attention was diverted by the gullies, and he did not notice the track until the forefeet of his team were on the track. To the contention that he should have been adjudged guilty of contributory negligence, it was said:

"Not so because of sitting down, as possibly this may have been a matter of precaution, for the management of his team in going down grade, and to avoid the ruts and side ditches. Nor can it be stated, as a matter of law, that he should have stopped again to look and listen" (citing *Winey v. Chicago, M. & St. P. R. Co.,* supra).

The principle is well expressed in *Platter v. Minneapolis & St. L. R. Co.,* 162 Iowa 142:

"A traveler upon a public highway is not bound to look or listen at any particular place, nor is he bound, as a matter of law, to look, especially where his view is obstructed at any given point, as he passes along the highway. The obstructions to his view are to be taken into account, and he also has the right to rely upon the railway operating its trains in accord with the law and ordinances of the city. If failure to do these things is calculated to mislead a traveler, the company cannot complain of his conduct when acting in reliance upon the performance thereof. He has the right to rely upon a burning headlight, when such headlights should be lighted; on the ringing of the bell; and, in exceptional cases, within a town, especially where the crossing is a dangerous one, upon the blowing of the whistle or some other warning: and, if he does so, and at the same time exercises the ordinary precautions of sight and hearing, he cannot be held guilty of contributory negligence, as a matter of law. In such circumstances, the question is one of fact for a jury."

In *Davitt v. Chicago G. W. R. Co.,* 164 Iowa 216, the driver of the team approaching the track looked and listened when 150 feet distant, and again when 100 feet from the crossing, and did not see the train; but, had he looked at a distance of 50 feet, the jury might have found that he would have seen it, and,

had he kept a continual outlook, he must have seen. The court held that:

"He had the right to expect a compliance with the custom of giving signals at that crossing; and, if he listened and heard nothing, there was presented a question for the jury to determine whether he was, at the time, exercising due care."

See, also, *Brossard v. Chicago, M. & St. P. R. Co.*, 167 Iowa 703, where it is said that the law does not fix any point at which a traveler should look and listen, but does exact of him the exercise of ordinary care, in passing over the crossing.

It will be recalled that, Reinig driving and Berger at his side, the automobile came down Fourth Street in a westerly direction, and, as it approached Seigel Street, they might have seen the defendant's track near the interlocking switch; and that, as they turned north on Seigel Street, they could have seen defendant's track at an increasing distance west of the crossing; when 85 feet south of the south rail, 175 feet of the track west; when 64 feet south of the south rail, 220 feet of the track west. The jury might have found that the train had not reached either point, when the automobile was 64 feet south of the south rail, and decedents are presumed to have known that defendant's train was required not to move at a greater speed than 6 miles an hour. Moreover, there were no witnesses to what they did after turning north, until observed within 20 feet from the south rail,—giving effect to the presumption that, in the meantime, they were exercising due care.

We meet the inquiry whether Berger is to be conclusively adjudged to have been guilty of contributory negligence, or was that issue for the jury? The additional facts should be stated: (1) The train was moving at a speed of 20 to 35 miles an hour; the automobile, 10 to 15 miles an hour. (2) One Oswald drove over the crossing, about 15 feet ahead of decedents, and, after crossing, motioned in warning. If the automobile was moving at 15 miles an hour, this would be 66 feet in 3 seconds; if at 10 miles an hour, 14.6 feet a second,—65.7 feet in 4½ seconds. This is mentioned to indicate how brief a time the automobile required in moving to the crossing, after decedents might have looked up the track 220 feet, and have seen no train approaching. Might they have taken into consideration, then, that a

train, if approaching, might not lawfully exceed in speed 6 miles an hour? The court has repeatedly so held, as seen; and, if that might be so done, what weight is to be given this circumstance? Are former decisions to rule, especially *Davitt v. Chicago G. W. R. Co.*, 164 Iowa 216, where reliance on warnings required by law, not sounded, was held to excuse for not looking within 100 feet? Might decedents have proceeded for 3 or even 4½ seconds, without looking for a train again? Or, if they did so, must they be denounced as conclusively negligent, or should that issue be left to the jury? Reasonable minds might differ in answering this inquiry, and for this very reason this court ought not to assume to say that the issue is not fairly debatable, under the evidence in this case. The opinion, as the writer thinks, correctly ruled that the issue of contributory negligence was for the jury to pass on, and he would overrule the petition for rehearing.

WEAVER, C. J., EVANS, PRESTON, STEVENS, and ARTHUR, JJ., concur.

SALINGER, J., dissents.