Frances V. Maltby and Pierre V. Maltby, Plaintiffs-
Appellees, v. Chicago Great Western Railway
Company, Defendant-Appellant.

Gen. No. 10,533.

Opinion filed May 20, 1952. Rehearing denied July 22, 1952. Released for publication July 22, 1952.

WINSTON, STRAWN, SHAW & BLACK, of Chicago, and CARBARY & CARBARY, of Elgin, for appellant; GERARD E. GRASHORN, GEORGE B. CHRISTENSEN, and EDWARD J. WENDROW, all of Chicago, and GEORGE D. CARBARY, of Elgin, of counsel.

SEARS & STREIT, of Aurora, for appellees; EDWARD F. STREIT, and LLOYD J. TYLER, both of Aurora, of counsel.

MR. PRESIDING JUSTICE DOVE delivered the opinion of the court.

Frances V. Maltby and Pierre V. Maltby, wife and husband, in a trial before a jury in the circuit court of Kane county recovered verdicts against the appellant, Chicago Great Western Railway Company, in the sums of $25,000 and $15,000, respectively. Appropriate motions for directed verdicts, for judgments notwithstanding the verdicts, and for a new trial on behalf of defendant were denied and the trial court rendered judgments on the verdicts, and the defendant appeals.

The complaint as amended consisted of four counts. By counts one and three, Frances V. Maltby sought to recover damages for personal injuries which she

received as a result of a collision between an automobile she was driving and defendant's locomotive and for money expended by her for medical treatment and for loss of earnings. By counts two and four, her husband, Pierre V. Maltby, sought to recover for damages he sustained by reason of his wife being injured, for his loss of consortium, for money which he had expended and would expend for her treatment, and for his automobile, which was demolished as a result of the collision. Counts one and two were based on negligence, and the same acts alleged to have been done negligently by the defendant in these counts, one and two, were alleged to have been done wilfully and wantonly in counts three and four. At the conclusion of plaintiffs' case, subparagraph (d) of all four counts and paragraph (g) of counts one and two were withdrawn on motion of the plaintiffs.

The substance of the allegations of appellees' complaint is that on January 26, 1949, a public highway running north and south crossed three sets of the appellant's railroad tracks which ran in an easterly and westerly direction near St. Charles, Illinois; that this public highway separated certain industrial buildings belonging to the St. Charles Manufacturing Company and the plant of the Moline Malleable Iron Company; that the buildings of the St. Charles Manufacturing Company were on the west side of the highway and north of the several tracks of the railroad company and partially or wholly obstructed the view to the west of the appellant's railroad track by a person driving in a southerly direction; that there were no signs, boards, flashers, or other appropriate warning devices on the north side of appellant's railroad crossing; that on the 26th day of January, 1949, and for a long time prior thereto, automobiles were parked in the right-of-way space owned by appellant between the two southerly sets of tracks and the north set of tracks

444

of appellant and immediately adjacent to the west side of appellant's railroad crossing, and these automobiles, so parked, obstructed the view to the west of the two southerly sets of railroad tracks of any person who was approaching said railroad crossing from the north; that this crossing was frequently traveled, and appellant knew, or should have known, that this crossing was extra hazardous. It is then alleged that at one o'clock on the afternoon of January 26, 1949, appellee, Frances Maltby, was driving south in an automobile owned by her husband, Pierre, and was in the exercise of due care for her own safety and for the property of herself and others. It was then alleged that appellant (a) negligently failed to provide warning signs, boards, signals, flashers, lights, bells, semaphores, markers, or other warning devices at said crossing, having regard to the frequency of use, obstructions to view and the extra-hazardous nature of said crossing as previously alleged; (b) negligently permitted or neglected to prevent automobiles from parking on the right-of-way of appellant so as to obstruct the view to the west; (c) negligently failed to ring the bell or blow the whistle for at least eighty rods from the crossing and failed to continue blowing the whistle or ringing said bell until the crossing was reached in violation of paragraph 59 of chapter 114 of the Illinois Revised Statutes [Jones Ill. Stats. Ann. 114.095]; (d) negligently failed to construct and maintain the crossing and approaches thereto, in violation of paragraph 62 of chapter 114 of the Illinois Revised Statutes [Jones Ill. Stats. Ann. 114.098]; (e) negligently failed to erect and maintain a board on the north side of said crossing in violation of paragraph 58 of chapter 114 of the Illinois Revised Statutes [Jones Ill. Stats. Ann. 114.094]; (f) negligently operated the train at an excessive speed having due regard for the frequency of the use, obstructions to view, and the

extra-hazardous nature of said crossing; and (g) negligently failed to operate the train with reasonable care and caution. The appellant answered admitting certain allegations of the complaint and denying others but specifically denying all charges of negligence and wilful and wanton conduct.

The evidence discloses that Frances V. Maltby was driving the automobile of her husband, Pierre V. Maltby, on January 26, 1949, in a southerly direction on a black-top road, referred to in the record as Foundry road, when it was struck by one of appellant's freight trains travelling on the main track and coming from the west at the grade railway crossing of Foundry road located just outside of and west of the city limits of St. Charles, Illinois, a city of 6,700 population. At this point and through the City of St. Charles the tracks run in an easterly and westerly direction. Dean street is a black-top road running in a northwesterly and southeasterly direction crossing the railway tracks at grade and at an angle, 300 feet west of the Foundry road crossing. Foundry road begins on the south side of the tracks at Dean street and proceeds north, crossing the three tracks of appellant at right angles. Where Foundry road crosses the main track of appellant is approximately 175 feet north of the point where Foundry road leaves Dean street. The southernmost track is the main track, the middle track is the passing track, and the track north of the passing track is the industrial or spur track. Immediately to the north of these tracks, Foundry road broadens out for a distance of about 250 feet into a combination road and parking space between the offices and plants of the St. Charles Manufacturing Company on the west side of Foundry road and the Moline Malleable Iron Company on the east side, after which it becomes a narrow, one-way dirt road, goes past two or three farm houses and terminates. It is used by officers and employees of the

446

St. Charles plant driving to work and is also used by trucks delivering materials to both the St. Charles plant and the Moline Malleable plant, and employees of both plants who park their cars in front of either plant use this Foundry road crossing. The St. Charles Manufacturing Company is a two-story brick building. In January 1949, about 200 persons were employed by the St. Charles Manufacturing Company. There is no evidence as to the number of employees of the Moline Malleable Iron Company, but its employees use the highway crossing some 600 or 700 feet east of the Foundry road crossing and park their cars on the east side of the Moline Malleable Iron Company plant. There is no means of public transportation to either of the manufacturing plants, and those who are there employed go to work either by walking or by automobile. Prior to the accident, cars customarily parked in the parking space immediately to the east and in front of the plant of the St. Charles Company and for the entire north and south length of its buildings, and cars, likewise, customarily parked on the appellant's right-of-way located between the industrial track and the passing track, which right-of-way was about twenty-five feet in width and extended to the west along appellant's tracks for a distance of several hundred feet. On the day of the accident, the testimony varied as to the number of cars parked on this right-of-way, some of the witnesses stating that two cars were there parked, other witnesses fixed the number of cars at five. The weight of the evidence is that no freight cars were standing on the industrial track west of Foundry road on the day of the accident. Immediately west of the front of the Moline Malleable Iron Company building and immediately east of the building of the St. Charles Manufacturing Company from its south line, in Foundry road, cars are frequently

447

parked and on the day of the accident a number of cars were parked there.

From the south side of the building wall of the St. Charles plant to the center line of the industrial track is 16.4 feet, from the center line of the industrial track to the center line of the passing track is 41.22 feet and from the center line of the passing track to the center line of the main track is 14.28 feet, which means that it is 71.9 feet from the south wall of the St. Charles plant building to the center line of the main track.

On the day of the accident, January 26, 1949, and prior thereto, Frances V. Maltby was employed as a laboratory technician in a Geneva hospital, and her husband was an accountant with the Moline Malleable Iron Company. Mr. Maltby had worked until noon on this day, and he drove to the hospital, picked up his wife, and he and his wife had lunch together at their home. After lunch she drove him back to the Moline plant in the family car. They used various streets until they came to Dean street, where they stopped and picked up another employee, Marion Doherty, of the Moline Malleable plant. When Mrs. Maltby came to Foundry road, she turned north on it and proceeded across appellant's three railroad tracks to the office door of the Moline Malleable plant. There she let her husband and Marion Doherty out of the car and she then turned the car around and started driving in a southerly direction back over appellant's railroad tracks. She knew the tracks were there, having just crossed them, and had also crossed them on other occasions. As she proceeded south, an 83-car freight train of appellant was approaching from the west going east on the main line track. This train was pulled by a three-unit, electromotive Diesel, fifteen feet high. There was a collision, and the Maltby car was knocked about fifty feet east of the crossing, and Mrs. Maltby was thrown from the car and sustained serious injuries.

448

Mrs. Maltby testified that she stopped her car in the center of Foundry road in front of the Malleable plant; that her husband and Marion Doherty got out and closed the door of the car and that she then started to turn around. As abstracted, she then said: "I don't know anything about coming between these two buildings in a southerly direction. I don't remember hearing any whistle. I don't remember anything. I don't know anything about it. I don't know whether I heard a bell on a train or not. I don't know how fast I was going as I approached the track. I have been over that crossing five or six times prior to January 26, 1949. I know that post at the crossing as you go toward the north, that is all I have seen. I have seen the so-called cross buck which is two boards crossed at an angle. I knew the tracks were there."

Frank L. Woods testified that he was the fireman on the left-hand side of the cab of the engine which struck the Maltby automobile; that he saw Mrs. Maltby as she came across the industrial track and watched her as she approached the crossing from the north; that when the front end of the Diesel was between 100 and 150 feet west of the crossing, he estimated her speed at twenty miles an hour, and that she continued toward the crossing at that rate of speed until her car passed out of view; that he shouted to the engineer that they were going to hit a car and for him to set the emergency brake. The emergency brake was set and remained set until the train came to a stop, which was after fifty-five of its cars had passed the Foundry road crossing. H. G. Brown was the engineer and on the right-hand side of the cab of the Diesel as it approached this crossing, and he testified that 80 rods west of the Dean street crossing was a whistling post; that as he got to the whistling post he started to sound the whistle of two long blasts then a short and a long which continued right up to the Foundry road crossing; that

449

the bell had been ringing continuously from Stockton, where he had taken over the engine. In this respect, Woods, the fireman, corroborated the engineer. L. J. Kenney testified that he was head brakeman, riding in the rear unit of the three-unit Diesel, and that as he approached the Foundry road crossing he heard the whistle sounding and observed the Maltby car coming over the industrial track and continued to watch it until the collision. He stated that its speed was 20 miles per hour and that its speed remained constant from the time he saw it until the time of the collision. Woods, Brown and Kenney all testified that the train was going 40 miles per hour. The fireman testified that he looked at the speedometer when he was 2,000 feet from the crossing and it registered 40 miles an hour, and from that point to the crossing the train was drifting. Four employees or officers of the Moline plant who observed the train from their positions in the plant and as they looked out of a window or door as the train crossed the crossing after the collision estimated the speed of the train at fifty miles per hour.

Floyd Robshaw testified that he was foreman of a bridge gang and on the day in question was at a switch about one-half mile east of the Moline plant and heard this train whistle as it approached the Foundry road crossing. Claude Richman testified that he was at the crossing east of the Malleable plant and that he saw the train and heard it whistle when it was about 1,000 feet west of the Dean street crossing as it was coming around the curve west of that crossing. He further testified that when the engine went past him, after the collision, the bell was ringing.

Other witnesses testified on behalf of appellees that they heard no whistle as the train approached the crossing, and several witnesses stated that there was an interval of ten to fifteen seconds between the time

the blowing of the whistle ceased and the noise made by the collision of the train and automobile.

At the trial, and over appellant's objections, the court admitted into evidence four letters which constituted an exchange of correspondence between R. A. MacNeille, president of St. Charles Manufacturing Company, and S. M. Golden, the vice-president of appellant. These letters were identified as Exhibits 7, 8, 9, and 10. Exhibit 10 was a letter dated December 17, 1948, and was from Golden to MacNeille. Exhibit 9 was a letter dated December 23, 1948, written by MacNeille to Golden in reply to Golden's letter of December 17th. Exhibit 8 was a letter dated January 8, 1949, from Golden to MacNeille, and Exhibit 7 was a letter dated January 11, 1949, from MacNeille to Golden in reply to Golden's letter of January 8th.

Mr. MacNeille was called as a witness on behalf of appellees and testified that he was president of the St. Charles Manufacturing Company and in 1945 he had some correspondence with S. M. Golden, now deceased, but who then was vice-president of appellant. He further testified that such correspondence had been destroyed and, after stating that he recalled the substance of that correspondence, he was asked: "Will you relate in general the substance of the correspondence in 1945." An objection was interposed by counsel for appellant and, in response to an inquiry from the court, counsel for appellees stated: "I am offering letters written by MacNeille only for the purpose of showing notice to the railroad company and correspondence from the railroad company generally." The court then stated: "It may be admitted and restricted to the question of giving notice to the railroad company as to the condition of the crossing at that time." Counsel for appellees then asked the witness (Mac-Neille): "Give us the substance of the correspond-

451

ence,'' and the witness answered: ''It was just a request on my part that adequate protection be provided.'' Upon cross-examination, this witness testified that the cross-buck sign was already at this Foundry road crossing in 1945 and that after the correspondence appellant put up a yellow sign, like a highway sign, with the word ''stop'' on it.

In the letter of Mr. Golden to Mr. MacNeille, dated December 17, 1948, Mr. Golden said: ''With reference to the matter of installation of automatic crossing signal protection at crossing adjacent to your plant and plant of the Moline Malleable Iron Company concerning which matter we exchanged a number of letters during the latter part of the year 1945: At that time, as your file will indicate, we felt that Great Western could not afford to put in this type of signal protection at our expense and in lieu thereof we arranged for the installation of standard crossing stop signs. During the past few months, however, we have been looking into the possibility of our being able to dispense with the flagman we employ at Main Street crossing, St. Charles (where we also have flashing light signals), whose services cost us approximately $5,000 per year. It is our plan, if we are successful in securing authority to eliminate this flagman, to install automatic signal protection at the crossing between your plant and the Moline Malleable Iron Company. In order to remove the flagman at Main Street we must appeal to the Illinois Commerce Commission and, of course, that body will be sympathetic with the views of the City officials. With this in mind I asked Mr. R. R. Fauntleroy to use his influence with the St. Charles City Council in helping us to get the flagman position abolished which he readily agreed to do. Unfortunately, however, Mr. Fauntleroy left for Arizona, where I understand he plans to remain until some time next May, before the matter could be handled to a conclusion

with the City authorities. The thought occurs to me at this time that possibly you would be in a position and willing to help us out in the handling of this matter to a conclusion with the City Council and if that body will agree not to offer any protest to the removal of the flagman at the Main Street crossing, we will immediately petition the Illinois Commerce Commission for authority to discontinue his job and at the same time request authority to install the automatic protection near your plant at our exclusive expense. I shall appreciate hearing from you in regard to this matter at your earliest convenience.''

Mr. MacNeille answered this letter on December 23, 1948, and said: ''I wish to acknowledge your letter of December 17 with reference to signal protection at the crossing adjacent to our plant and also with reference to flagman protection at the Main Street crossing in St. Charles. We are convinced that automatic signal protection is needed at the crossing adjacent to our plant. However, we do not feel that there is any relationship between this protection and the necessity for adequate protection at the Main Street crossing in St. Charles. It seems to me that I would be putting myself and my company in a peculiar position if I were to advocate removal of the Main Street flagman. As a matter of fact, there is considerable question in my mind as to whether or not the flagman should be removed at this crossing which is on a bad angle and involves considerable traffic. We do not believe that it is fair to make the installation of automatic signals at our plant contingent upon elimination of the Main Street flagman, and we would like to renew our former request for adequate protection. I am sorry that I am unable to help you in this matter, but I am sure you will appreciate my position and understand why I do not feel that I should assume the responsibility involved.''

On January 8, 1949, Mr. Golden replied as follows: "Replying to your letter of December 23rd with reference to the matter of removal of the crossing flagman employed by this Company at Main Street crossing, St. Charles: In regard to the renewal to your request for automatic signal protection at the crossings adjacent to your plant; as previously pointed out to you the railroad cannot be expected to carry the entire burden of such expense, especially at such crossings which are considered private. However, knowing that you were anxious to have more adequate protection at these particular crossings, it was my thought we would be in a better position to justify the expenditure for this additional protection in St. Charles if we could be relieved of the crossing flagman expense in Main Street. We really do not see the necessity for maintaining the flagman at Main Street in addition to the flashing light signals which in themselves provide adequate protection twenty-four hours per day. During the hours this flagman is on duty (7:45 AM to 6:45 PM) we have six passing trains scheduled. During the period there is no flagman on duty, and the crossing is protected by the flashing light signals only, we have seven passing trains scheduled; although on many occasions there are only five trains passing when the flagman is on duty and eight when he is off duty."

On January 11, 1949, Mr. MacNeille wrote Mr. Golden as follows: "Thank you for your letter of January 8 in which you explained further the problems involved in providing automatic signal protection at the crossing adjacent to our plant. We sincerely hope that something can be done in the near future. We can appreciate your feeling regarding the flagman at the main street crossing. However, we hope you can appreciate why we feel that we would be putting ourselves in a peculiar position by recommending the elimination of this flagman in order to obtain protection at our plant.

It seems to me that we would be putting ourselves in a very unenviable position in case there ever was an accident at the Main Street crossing, and we do not feel that it is up to us to take this responsibility.''

It is argued by counsel for appellees that the only interpretation that can be placed upon the Golden letters is that flasher protection was required· at this crossing in order to adequately protect the public, that appellant recognized the necessity for this protection but refused to install flashers on the ground that it could not afford it; that appellant would not have agreed to install flasher protection at this crossing had it not been needed and therefore the contents of the Golden letters were admissible in evidence as an admission against interest and being so admissible, Mac-Neille's testimony and replies to these letters were likewise competent evidence. Counsel state that Mac-Neille's oral testimony and his letters do not prove that the crossing was extra hazardous but insist that this proof appears from other evidence found in the record and that by this evidence notice of the hazardous condition of this crossing was called to the attention of appellant and, therefore, the company ''could not thereafter get away from its alleged wilful and wanton conduct because of lack of notice.''

It was not Golden who said that automatic signal protection was needed at this crossing. That statement was contained in MacNeille's letter. Golden said that appellant, in 1945, felt that it could not afford to install automatic signal protection at this crossing, and then went on to say that if the company could secure authority to eliminate a flagman at the Main street crossing in St. Charles, it planned then to install automatic signal protection at the Foundry road crossing and enlisted the help of Mr. MacNeille to bring this about.

██ The complaint in this case alleged that this crossing was an extra-hazardous one. The answer de-

nied this allegation. The Public Utility Act vests the Commerce Commission with authority, after making proper investigation, to designate those grade crossings which are deemed extra hazardous and, having done so, grants to them authority to order the installation of protective devices and also grants to the Commission the power to determine and prescribe the manner and terms of installation, operation, maintenance, use and protection of all grade highway crossings and railroad tracks. (Ill. Rev. Stat. 1951, chap. 111 2/3, par. 62 [Jones Ill. Stats. Ann. 112.083].) Irrespective of any statutory requirements, however, there is a common-law duty devolving on appellant to exercise such precautions at this crossing as would enable travelers to ascertain the approach of a train. (*Applegate v. Chicago & N. W. Ry. Co.*, 334 Ill. App. 141, 151.)

No authority has been cited, and we are unable to find any, that the evidence of Mr. MacNeille to the effect that his letters to Mr. Golden in 1945 requesting adequate protection for the Foundry road crossing was competent for any purpose. If it was, then the testimony of anyone that he had requested a railroad company to more adequately protect a crossing would be competent if the company let the request go unheeded and there was subsequently an accident at that crossing and ensuing litigation. So, too, the statement of Mr. MacNeille in his letter of December 23, 1948, where he says, "We are convinced that automatic signal protection is needed at the crossing adjacent our plant," and the statement in his letter of January 11, 1949, where, after thanking Golden for his explanation of the problem involved in providing automatic signal protection at this crossing, he concluded, "We sincerely hope that something can be done in the near future." What this evidence and the contents of Mr. MacNeille's letter tended to prove was that this crossing, in the

opinion of Mr. MacNeille, was not adequately protected at any time prior to the time Mrs. Maltby was injured. If this evidence is competent then all other persons who may have had and expressed similar views to an officer of appellant would be permitted to take the witness stand and give to the jury the benefit of their opinions.

██ ██ As said in *Hughes v. Wabash R. Company,* 342 Ill. App. 159, 172, the defendant in the instant case was not required to protect the Foundry road crossing with safety devices unless it was an extra-hazardous crossing. Whether it was or not was a jury question. The *Hughes* case held that the trial court erred in permitting an assistant chief engineer of the Commerce Commission, after testifying what elements are taken into consideration by experts in determining the question whether a given crossing is extra hazardous, to express his opinion that a crossing described in a hypothetical question was an extra-hazardous crossing.

██ ██ It is universally accepted that opinion evidence or declarations such as contained in the MacNeille letters in the instant case would not be admissible if they were made by plaintiffs in this proceeding, and they are likewise inadmissible when made by a stranger to the record. In *Partlow v. Illinois Cent. R. Co.,* 51 Ill. App. 597, it was held that the trial court properly sustained objections to an offer to prove that officials of the village of Humbolt had made complaint to the railroad company about the speed of the train which struck and killed plaintiff's intestate. In the course of its opinion, the court said: "If the customary speed of the train at that place was dangerous, the company was bound to know it without being so notified by the village officials or anyone else and if it was not dangerous no mere complaint would make it unlawful." In the instant case, as suggested by counsel, if the Foundry road crossing was extra hazardous the

457

defendant was charged with that knowledge without being notified by Mr. MacNeille or anyone else. In *Willett v. Baltimore & O. S. W. R. Co.*, 284 Ill. App. 307, 314, it is said that a defendant railway company was charged with knowledge of the condition of its crossings.

"An admission is defined by Stephen to be a 'statement, oral or written, suggesting any inference as to any fact in issue or relevant or deemed to be relevant to any such fact, made by or on behalf of any party to any proceeding.' Bouvier defines admissions to be 'confessions or voluntary acknowledgments made by a party of the existence or truth of certain facts.' " (Jones Commentaries on the Law of Evidence, Vol. 2, sec. 235, p. 349.) Any statement, whether oral or written, made by or attributable to a party to an action, which tends to establish or disprove any material fact in a case is competent evidence against him in such action. (31 C. J. S., Evidence, sec. 272, p. 1023.) Evidence is not admissible unless it is relevant to the issue, or issues, in the case, and this principle applies to admissions and declarations to the same extent that it does to other kinds of evidence. Irrelevant declarations are inadmissible. (20 Am. Jur., Ev., sec. 545, p. 461.) In our opinion, what the plan of the defendant with reference to this crossing was in 1945 or 1949 was irrelevant to the issues submitted to the jury in this case. Whether appellant would be able to prevail upon the Commerce Commission to permit it to eliminate a flagman at the Main street crossing in St. Charles was not relevant to any issue in the instant case nor was appellant's plan to petition the Commerce Commission for authority to install automatic protection at the Foundry road crossing if and when the Commerce Commission permitted it to dispense with the flagman at the Main street crossing in St. Charles.

Mr. Golden's letters state that his company has been looking into the possibility of being able to dispense with its flagman at the Main street crossing in St. Charles and concludes that if the company is able to secure authority to eliminate that flagman, then the company plans to install automatic signal protection at this crossing. In our opinion, this was not a recognition by the company that this was an extra-hazardous crossing and required the installation of automatic signal protection, and it was error to admit any of these letters in evidence. The admission made by a defendant against interest must always be material and relevant to the controversy. "The reason for the admission of such statements is both clear and compelling. They are admitted because conduct of a party to the proceeding, in respect to the matter in dispute, whether by acts, speech or writing which is clearly inconsistent with the truth of his contention is a fact relevant to the issue." (Jones Commentaries on the Law of Evidence, Vol. 2, sec. 236 (237), p. 362.) In *Barrett v. Chicago, M. & St. P. Ry. Co.,* 190 Iowa 509, 175 N. W. 950, it was held that whether a city and a railroad had ever negotiated with respect to protecting a crossing by gates or a flagman had no bearing on the issue whether the railway company was negligent in not keeping a flagman at the crossing.

The verdicts returned by the jury in this case were general and simply found the defendant guilty as to the claim of both plaintiffs and assessed damages. It must be presumed, therefore, that the jury found the defendant guilty of wilful and wanton misconduct. (*Greene v. Noonan,* 372 Ill. 286, 291.) Counsel for appellant earnestly insist that there is no evidence tending to support the wilful and wanton counts of the complaint and that the trial court erred in submitting the issues made by those counts to the jury. We have read the evidence in this case, examined

the several photographs and plat found in the record and the several cases which counsel particularly called to our attention in support of this contention. We are unable to say, however, from all the evidence, facts and circumstances appearing in this record that the trial court erred in permitting the case to go to the jury on the wilful and wanton counts. We refrain, however, from any further comment upon the evidence or upon the weight of the evidence.

█ █ We think there is considerable merit in appellant's criticism of the instructions complained of inasmuch as they permitted the jury to find the defendant guilty of wilful and wanton misconduct if the jury concluded from the evidence that defendant was guilty of any one of the several charges contained in the complaint. We think the jury may have been misled by the wording of these several instructions. We are also clearly of the opinion that the verdict returned in favor of Pierre V. Maltby for $15,000 was not warranted by the evidence found in this record.

█ The motion of appellees to strike the reply brief and argument of appellant or, in the alternative, to strike certain portions thereof was taken with the case. The portion of the brief objected to is a statistical table, designated as Appendix A, appearing on page 33 of the reply brief and counsel's comment in connection therewith. This appendix purports to be a copy of page 66 of the thirty-first annual report of the Illinois Commerce Commission and gives the number and type of crossing installations authorized by the Commerce Commission from July 1, 1925, to June 30, 1948. It was not offered in evidence. In order to pass upon appellees' motion to strike, it was necessary for us to read the portions objected to. We have done so, and, in view of the conclusion we have arrived at, the disposition of this motion to strike need not be given any further consideration. To either sustain or

deny it would be of no benefit to any of the parties involved in this litigation.

For the reasons stated, the judgments of the circuit court of Kane county are reversed and this cause is remanded for another trial.

*Reversed and remanded.*