Leonard DAVIS

v.

**Theodor SCHUCHAT, Appellant.**

**No. 72–1799.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 25, 1974.

Decided Jan. 22, 1975.

Lanny J. Davis, Washington, D. C., with whom Robert A. W. Boraks, Washington, D. C., was on the brief, for appellant.

Morris B. Abram, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Leonard H. Becker and Daniel P. Levitt, Washington, D. C., were on the brief, for appellee.

Clark R. Mollenhoff, Washington, D. C., filed a brief as amicus curiae.

Before BAZELON, Chief Judge, and McGOWAN and MacKINNON, Circuit Judges.

McGOWAN, Circuit Judge:

The District Court, sitting without a jury, awarded damages in an action for slander. This appeal from that judgment raises a question as to the degree of protection afforded by the First Amendment to one who describes himself, as does appellant, to be an investigative journalist. There are also issues as to the standard of liability, if liability is to be imposed at all, and the propriety of punitive damages. For the reasons hereinafter appearing, we affirm.

I

Plaintiff-appellee, Leonard Davis, is the founder, a director, and a major shareholder of the Colonial Penn Group, an insurance company headquartered in Philadelphia, Pennsylvania. Colonial Penn provides group insurance coverage for two associations of retired persons—the American Association of Retired Persons (AARP) and the National Retired Teachers Association (NRTA). The latter, of which appellee is the honorary president, is affiliated with the National Education Association (NEA). Appellee's work in insurance, especially for the elderly, has led to a number of philanthropic, educational, and charitable positions, including the chairmanship of the board of directors of the Gerontology Center at the University of Southern California, and the chairmanship of the board of the Fund for the City College of New York.

At one time, appellee served as a director of Dental Insurance Plan, Inc. (DIP), a group insurance plan in New York. In 1963, some three years after his resignation from the DIP board, five officers of DIP were charged with criminal fraud under the laws of New York. They were subsequently convicted on their pleas of guilty. In 1965, appellee was indicted and tried in the United States District Court in New York on a charge that he committed perjury when he testified before the New York grand jury looking into the affairs of DIP. The district judge, sitting without a jury, dismissed one count at the close of the Government's case, and on the other count returned a verdict of not guilty.

Defendant-appellant, Theodor Schuchat, is a free-lance feature writer who specializes in matters concerning health, education, and welfare. Sometime in 1963, Schuchat became interested in the AARP and its relationship with appellee and Colonial Penn, and at that time he began keeping a file about appellee. In 1964 Schuchat began a more active investigation with the intent of writing a story about appellee and Colonial Penn.

The District Court's Findings of Fact and Conclusions of Law in their entirety, omitting only the jurisdictional finding, are as follows:

2. Plaintiff is a public figure within the meaning of New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and subsequent decisions.

3. Defendant is an investigative reporter and feature writer. He does not usually write "spot news," and "spot news" is not involved in this case.

4. In early 1964, defendant began to maintain a "watching brief" or file on plaintiff. In early 1970 defendant decided to try to develop an article relating to plaintiff and to certain organizations with which plaintiff is associated—Colonial Penn Group, the American Association of Retired Persons ("AARP"), and the National Retired Teachers Association

("NRTA"). NRTA is affiliated with the National Education Association ("NEA").

5. In early July 1970, by telephone, defendant told Dr. Glen Robinson, an NEA official, that plaintiff "had been convicted of a felony in New York."

6. On July 17, 1970, defendant repeated this statement orally to Dr. Robinson and to Mr. Jack Tennant, an associate of Dr. Robinson at NEA.

7. The statements by defendant were false. They were slanderous *per se*. The statements were made maliciously and, within the meaning of *New York Times* and subsequent decisions, in reckless disregard of the truth, pursuant to defendant's admitted technique of "throwing a lot of things out in an interview just to get a response."

8. Plaintiff has not asked for any special damages, but has asked for compensatory and punitive damages. Plaintiff has been injured by defendant's false statements, but it is difficult to fix a monetary amount that will compensate him for that injury. In view of that difficulty, and in view of the relative financial situations of the parties, the Court will grant nominal compensatory damages in the sum of $1.00 and punitive damages in the

sum of $1,500.00. The latter award takes into consideration the considerable expense of this case which plaintiff can probably well afford, and defendant ill afford.

II

The first and principal issue raised on this appeal is that the First Amendment mandates a complete immunity from liability for a slander made to a limited number of people by a reporter in the ordinary course of his preparations for a news story on a subject of general or public interest. The claim is, in other words, that it was error for the District Court to apply in this case the standard of liability first formulated in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).[1]

■ It is perhaps enough to point out that this is directly contrary to the position taken by appellant in the trial court. There it was urged by appellant that the *New York Times* standard was the applicable and governing legal rule, and should be applied by the court to the evidence before it. This is crystal clear from a reading of the trial transcript, and nowhere more so than in defense counsel's summation after the evidence was in when he says (Tr. 235), "So I ask the Court in light of the law, to apply New York Times."[2] The court did so,

1. It was there held that a state cannot constitutionally award damages to a public official for defamatory falsehood relating to his official conduct unless his proof shows "actual malice," which is defined as the statement's having been made with knowledge of its falsity or with reckless disregard of whether it was true or false. The Court's further development and elucidation of this doctrine are to be found in Cantrell v. Forest City Publishing Co., 419 U.S. 245, 95 S.Ct. 465, 42 L.Ed.2d 419 (1974); Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974); Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Ocala Star-Banner Co. v. Damron, 401 U.S. 295, 91 S.Ct. 628, 28 L.Ed.2d 57 (1971); Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971); Monitor Patriot Co. v. Roy, 401 U.S. 265, 91 S.Ct. 621, 28 L.Ed.2d 35 (1971); Greenbelt Coop. Publ. Ass'n v. Bresler, 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970); Beckley Newspapers Corp. v. Hanks, 389 U.S. 81, 88 S.Ct. 197, 19 L.Ed.2d 248 (1967); Asso-

ciated Press v. Walker, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Curtis Pub. Co. v. Butts, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); Time, Inc. v. Hill, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967); Rosenblatt v. Baer, 383 U.S. 75, 86 S.Ct. 669, 15 L.Ed.2d 597 (1966).

2. Appellee urged the District Court not to apply the *New York Times* standard. Although he did not believe himself to be a "public figure," his position was that, whether he was or not, this case was not on its facts within the ambit of *New York Times*. Appellee stressed in this regard that (1) no story was published in a newspaper or put over the air, (2) the slander occurred in the private setting of a conversation with third parties, and (3) the subject of that conversation was not a matter of public interest and concern. Under these circumstances, appellee contended, the defamation law of the jurisdiction applied, citing Francis v. Lake Charles American Press, 262 La. 875, 265

and now appellant tells us that it should be reversed for having done so. We are not, under these circumstances, obliged to take notice of the point at all: and it would require the most palpable and egregious error to cause us in these circumstances to reverse the District Court for the reason now urged. We are not persuaded that such reversal is required in the interests of justice.

■ The proposed new theory is grounded on the concept that the *New York Times* doctrine reflects a balancing between First Amendment interests and the probability of a given statement causing serious damage to a person's reputation. Appellant argues that the First Amendment interests are more important here than in the *Times* situation because "(a) an investigative reporter is particularly vulnerable to defamation actions and, hence, to self-censorship pressures; and (b) in these circumstances, where the alleged defamatory statements were made prior to publication, there is a serious danger of a constitutionally impermissible prior restraint." (Appellant's brief p. 21). By finding this "extra" First Amendment importance, appellant thinks to analogize his situation with the absolute immunity granted judges and legislators because of the "extra First Amendment interests" present in their situation.

The assertion that there is some special danger of self-censorship because of the allegedly peculiar nature of an investigative reporter's job, necessarily assumes that the investigative reporter must be allowed to make statements in interviews that he (or anyone else) would not be permitted to say in a "final context." We recognize that comment upon matters of public interest is entitled to greater protection than comment on matters of purely private interest, but we fail to see why a comment on a matter of public interest should be any more protected in the private sphere than it is in the public arena.

In an attempt to support his position, appellant argues that statements made in private cause less harm and are more easily rebutted than public statements, and that therefore statements made in private are entitled to greater protection. Appellant's own situation, however, points up why this is an unacceptable argument. He made his statements to a business associate of appellee, where such statements, if unrebutted, could do perhaps their greatest damage. Further, it was only by chance and the good will of the listener to the defamatory statements that appellant was given an opportunity to rebut the allegations made against him.

Appellant also argues that the fear of a slander action will operate upon the investigative reporter in some way as a prior restraint. The fear of a libel action subsequent to publication equally acts as a deterrent, however, and that deterrence clearly is permitted by *New York Times*. Again, the argument must rest upon the assertion, which we do not accept, that freedom of the press requires that reporters be allowed to assert in private what they would be subject to liability for if said in public media.[3]

So.2d 206 (1972), appeal dismissed, 410 U.S. 901, 93 S.Ct. 961, 35 L.Ed.2d 265 (1973); Kansas Electric Supply Co. v. Dun & Bradstreet, Inc., 448 F.2d 647 (10th Cir. 1971), cert. denied, 405 U.S. 1026, 92 S.Ct. 1289, 31 L.Ed.2d 486 (1972); Grove v. Dun & Bradstreet, Inc., 438 F.2d 433 (3d Cir.), cert. denied, 404 U.S. 898, 92 S.Ct. 204, 30 L.Ed.2d 175 (1971).

3. We do not, of course, imply that a journalist's protection is in any way reduced when he speaks of a public figure in private. Our understanding of *New York Times* and its offspring is that private persons and the press are equally protected by the requirement that false comment about public figures must be knowing or in reckless disregard of the truth in order to be actionable. It seems to us a necessary corollary that comment about public figures should be equally protected whether made in mass media or in private. This is required both by the First Amendment, which speaks equally of freedom of speech and of the press, and by common sense, for if the "press" were given more protection than "private speech," persons would be encouraged to rush allegations into wide publication rather than to carefully present them to informed parties for verification or refutation in a more private setting.

## III

The District Court found appellee to be a public figure; and measured liability by reference to *New York Times,* which as noted above, appellant pressed it to do. Appellee asserts on appeal that the judgment under review can be sustained within its own terms, inasmuch as the proof adduced by it in the trial court satisfies the *New York Times* standard. Appellee continues to say here, as he did in the District Court that he is not really a public figure, and that, whether he was or not, the trial court did not need, in order to find liability on this record, to be guided by the more rigorous standard of *New York Times.* We do not think it necessary, in the somewhat unusual posture of this case, to reach this alternative contention *if* we are of the view that the first is correct, namely, that the trial court did not err in its appraisal of the evidence as justifying a finding of actual malice within the contemplation of *New York Times.*

In approaching this reviewing task we are mindful of the Supreme Court's admonitions as to the manner of its performance. In Time, Inc. v. Pape, 401 U.S. 279, 91 S.Ct. 633, 28 L.Ed.2d 45 (1971), the Court said (at 284, 91 S.Ct. at 637):

> [In] cases involving the area of tension between the First and Fourteenth Amendments on the one hand and state defamation laws on the other, we have frequently had occasion to review "the evidence in the . . . record to determine *whether it could constitutionally support a judgment*" for the plaintiff . . . (Emphasis supplied).

As the Supreme Court stated in Time, Inc. v. Hill, 385 U.S. 374, 394, 87 S.Ct. 534, 545, 17 L.Ed.2d 456 (1967): "Where either result finds reasonable support in the record it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood."

■ In this case the court was the jury, but we have examined the record carefully, and we find it adequately supportive of the findings of fact made by the court. We have also reviewed the facts so found, and the evidence as a whole, with reference to the *New York Times* standard, and we think the judgment rendered is in accordance with it. The evidence was of two types: first, evidence that appellant fabricated his allegations and knew that he had no possible foundation for them; and, second, evidence that regardless of any possibility of good faith mistake by an uninformed person, appellant had acquired by the time he made the allegations sufficient information about appellee to know or to seriously suspect that his allegations were false.

Appellee offered two separate, and alternative, sets of circumstances that were said to justify a good faith (if mistaken) belief that appellee had been convicted of insurance fraud. The first good faith belief was alleged to have developed by reason of appellant's having seen (1) articles in a New York newspaper stating that appellee had been indicted in connection with an inquiry into the Dental Insurance plan, (2) articles speaking of the indictment of other officials of DIP for insurance fraud; and (3) articles that spoke of the "conviction of officers of DIP" (J.A. 62). From this he argued that he assumed that the latter articles on conviction included, at least by implication, reference to the conviction of appellee along with the others. This entire allegation fell, however, with appellant's admission that he had not learned of the conviction of *any* DIP officer until after he had made his slanderous statements. (J.A. 165).

Appellant's second claim to good faith belief rested on an alleged confusion between appellee and one Joseph Davis, an official of DIP who was indicted and eventually pleaded guilty to insurance fraud. Appellee attacks this, pointing out that appellant's own notes state, next to the name of Joseph Davis, "Fitch says no relative." (J.A. 275). More important, however, because of the admission that appellant had not seen any articles on Joseph Davis's conviction, this

story requires the same leap from knowledge of indictment to belief in conviction as is required by the prior story.

After appellant admitted that not even confusion between other DIP officials and appellant would support a belief that the latter had been convicted, appellant attempted to argue (for the first time in his testimony at trial) that "various people" had alleged that appellee had been convicted. No support for this argument was ever introduced, and we believe that the trial judge was fully justified in discounting this possible ground for a good faith belief. What appellant was left with in regard to this part of his defense is that he read that appellee had been indicted for perjury, he read that other officials had been indicted for fraud, and from this he formed a good faith belief that appellee had been convicted of some crime.

Appellant makes a final attempt to excuse his statement by arguing that he had a justifiable—and good faith—confusion between indictment and conviction. There may be some situations in which the misuse of a legal term will not support a finding of liability. See Time, Inc. v. Pape, supra. We note, however, that in statements by appellant contemporaneous with the slander, he showed that he was clearly aware of the difference between indictment and conviction, and of the importance of that difference. See letters to Mr. Boyd, J.A. pp. 263–71. We find that the district judge was entirely justified on this record in finding that the accusations made by appellant were in reckless disregard of the truth and could not have been the result of a reasonable mistake.

There is also evidence in the record that might have sustained a finding that appellant knew his statements to be in fact false. This finding could have been based on the testimony of the witness Iverson, an attorney in appellee's attorney's law firm, who testified that shortly after the slanderous utterances, and be-fore appellant performed the investigations that he claimed led him to realize his mistake, appellant was extremely knowledgeable about appellee's case—to the extent of it being extremely likely that he knew of the acquittal. The weight of this evidence depends to a great extent on the trial court's evaluation of the credibility of appellant when he denied such knowledge. Reading the record, which is replete with instances of evasiveness and contradiction in appellant's testimony, we find that the trial judge would be justified in believing the Iverson testimony and drawing therefrom, and from appellant's own performance on the witness stand, the inference that appellant in fact knew of the falsity of his statement. At the very least, the testimony as to the extent of appellant's knowledge could support a finding that he acted in reckless disregard—that he in fact entertained substantial doubts about the truth of his statements.

## IV

Appellant's final point is that, even if he is liable for slanderous utterance, punitive damages are beyond the constitutional barrier. Since this appeal was taken under submission, however, the Supreme Court has decided Gertz v. Welch, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The Court there held that a publisher or broadcaster of defamatory falsehoods about one who is neither a public official nor a public figure is not entitled to New York Times protection for defamatory statements even though they relate to an issue of public or general interest.[4] This means that, so long as local defamation law does not impose liability without fault, it may, without impingement upon the First Amendment, subject the defamer of a private individual to a less demanding standard than the New York Times rule of knowing falsity or reckless disregard.

---

4. In so holding, the Court retreated from Rosenbloom v. Metromedia, note 1, supra, where it had carried New York Times beyond public officials and public figures to private persons claiming defamation in a matter of public or general interest.

Of critical importance to the punitive damage issue presently before us, however, is another aspect of the Court's decision in *Gertz*. That is the further holding to the effect that, if local law elects to exercise this freedom, there can be no award of presumed or punitive damages. Such damages are, contrarily, available only where liability is adjudicated by reference to the *New York Times* standard.[5]

■ Whatever doubts may have arisen about the propriety of punitive damages from the multifarious expressions on the subject in past Supreme Court opinions, *Gertz* appears to have linked the propriety of punitive damages to the rigors of the *New York Times* definition of actual malice. Since liability in the case before us was found by reference to that standard, there appears to be no constitutional defect in the punitive damage award in this case. Appellee was, of course, found to be a public figure, as distinct from the private person involved in *Gertz*. But the majority opinion in *Gertz* is at least subject to the implication that violation of the exacting standard of *New York Times* justifies the award of presumed or punitive damages even in the case of a public official or public figure.

It is arguable also that this reading of *Gertz* does not change the law on damages under *New York Times* as it existed before. There was an inconclusive discussion of the availability of punitive damages in *Rosenbloom*, which appears to have ended in the view that a requirement of malice was preferable to a limi-

tation on damage awards to protect "public figures." We do note, however, that in Curtis Publishing Co. v. Butts, the sole Supreme Court case in which a damage award has been upheld in this field, the Court permitted punitive damages.[6]

The Second Circuit has, prior to *Gertz*, directly considered the problem, and has determined that punitive damages are appropriate and permissible where malice, as defined by *New York Times*, is shown. Goldwater v. Ginzburg, 414 F.2d 324 (2d Cir. 1969), cert. denied, 396 U.S. 1049, 90 S.Ct. 701, 24 L.Ed.2d 695 (1970) (awarding $1.00 in compensatory damages and a total of $75,000 in punitive damages). We believe that their reasoning is correct, recognizing as it does, the purpose of punitive damages as "(1) the protection of the libeled individual's reputation and (2) the protection against like abuse of all other persons similarly situated." *Id.* 414 F.2d at 341 (citing Curtis Publishing Co. v. Butts, *supra*, 388 U.S. at 161, 87 S.Ct. 1975, 18 L.Ed.2d 1094). *See also* Afro-American Publishing Co. v. Jaffe, 125 U.S.App.D.C. 70, 366 F.2d 649 (1966).

■ As Justice Brennan recognized in *Rosenbloom*, the First Amendment requires that press and speech comment on matters of public interest be given the wide latitude granted by the *Times* standard. Once that latitude is exceeded, however, we fail to perceive that any further purpose is served by eliminating traditional punitive damages, which have always been subject to correction for ex-

---

5. The Court said in this regard:

[W]e endorse this approach in recognition of the strong and legitimate state interest in compensating private individuals for injury to reputation. But this countervailing state interest extends no further than compensation for actual injury. For the reasons stated below, we hold that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of knowledge of falsity or reckless disregard for the truth.

In short, the private defamation plaintiff who establishes liability under a less demanding standard than that stated in *New*

York Times* may recover only such damages as are sufficient to compensate him for actual injury.

6. The major problem with reliance on this case is that the four members of the Court joining in the plurality opinion were operating on the belief that something less than malice was required. This lesser standard was again supported by the two members of the *Curtis* plurality who were still on the Court when Rosenbloom v. Metromedia was decided (Justices Harlan and Stewart). In that case, however, Justices Harlan and Stewart stated that punitive damages should not be allowed.

cessiveness. Punitive damages are allowed because the civil law has long recognized that in certain situations deterrence can better be achieved through modification of the civil awards than through a requirement of criminal sanctions.

Under the law of this jurisdiction, punitive damages are contemplated in appropriate circumstances.[7] So long as the punitive damages award does not exceed the limits of propriety, *see* Afro-American Publishing Co. v. Jaffe, *supra*, and is based upon a finding of actual malice and some compensable damages (which were found here), we believe that such an award is proper. The $1,500.00 allowed for this purpose in this case raises no issue of excessiveness.

Affirmed.

BAZELON, Chief Judge, did not participate in the deliberations on or decision in this case.

**7.** Under D. C. law, "punitive damages need not have any necessary relation to compensatory damages." Afro-American Publ. Co. v. Jaffe, 125 U.S.App.D.C. 70, 83, 366 F.2d 649, 662 (1966) (*en banc*) (citing Wardman-Justice Motors v. Petrie, 59 U.S.App.D.C. 262, 39 F.2d 512 (1930). It remains within the trial court's discretion, when a jury awards excessive punitive damages, to put the plaintiff to a new trial or remittitur, Collins v. Brown,

268 F.Supp. 198 (D.D.C.1967) (Holtzoff, J.), but a trial court sitting without a jury has the widest discretion in fixing an amount. United Securities Corp. v. Franklin, 180 A.2d 505 (D.C.Mun.App.1962). In determining whether a punitive award is excessive, the plaintiff's cost of litigating and the defendant's unjust enrichment may also be taken into account. Afro-American Publ. Co., *supra*, 366 F.2d at 662–663.