JOSEPH E. FOPAY, Plaintiff-Appellee, *v.* RICHARD J. NOVEROSKE, Defendant-Appellant.

(No. 71-27;

Fifth District—August 14, 1975.

Robert F. A. Stocke, of Louisville, and James L. Brissenden, of Smith, McCollum & Riggle, of Flora, for appellant.

John R. Meyer, of Meyer & Meyer, of Flora, and James B. Wham, of Wham & Wham, of Centralia, for appellee.

Mr. JUSTICE KARNS delivered the opinion of the court:

This appeal is from a judgment entered in Clay County upon a jury verdict for libel in favor of plaintiff-appellee, Joseph Fopay, against defendant-appellant, Richard Noveroske, in the amount of $27,500 compensatory and $20,000 punitive damages.

Plaintiff alleged in his complaint that while he was chief x-ray technician at Clay County Hospital, defendant, chief radiologist at the hospital, maliciously published four letters by circulating them to other

radiologists, hospitals, and representatives of national professional radiologists' organizations. The complaint alleged that the publications charged plaintiff with dishonesty and incompetency in the performance of his duties at Clay County Hospital and that the charges were false. The complaint prayed for general, special, and punitive damages. Plaintiff based his prayer for special damages on the loss of employment and inability to find employment elsewhere as an x-ray technician. The prayer for special damages was subsequently stricken. In his answer, defendant denied plaintiff's specific allegations and pleaded as affirmative defenses that the letters were published in good faith without malice and were privileged; that the letters were constitutionally protected because plaintiff is a public official and the operation of the hospital is a matter of public concern; that the matters contained in the letters were true; and that plaintiff had consented to publication of all or part of these letters.

The evidence at the trial was as follows. Plaintiff had been chief x-ray technician at Clay County Hospital for 10 years. His duties included the taking of x-rays, the maintenance of the x-ray room and the supervision of two assistants, Zota Croughan and Shirley Phillips. Defendant served as radiologist at the hospital on a part-time basis and his responsibilities included the supervision of the work of the plaintiff. On June 16, 1966, defendant approached the administrator of the hospital, Lester Gerber, with a memo alleging that on three instances plaintiff charged illegal "call backs"[1] for x-ray work done, that plaintiff kept an unclean department, and that plaintiff was incompetent as an x-ray technician. Defendant was told to wait until he got his Illinois license before pressing the matter further.

Defendant obtained his license and prepared a September 8, 1966, memorandum which set out in detail the allegations of the illegal call backs, uncleanliness, and incompetence. Defendant presented this memorandum to the medical staff of Clay County Hospital on September 14, and to the Lay Board of the hospital at a meeting attended by plaintiff and his attorney on September 28. It was here that defendant formally confronted plaintiff with the charges in the memorandum. Also at this meeting defendant charged plaintiff for the first time with the "illegal" sale of x-ray film. Defendant asked plaintiff to resign and plaintiff refused. The Lay Board refused to take any action relative to the charges until further investigation, and plaintiff was given more time to answer the charges.

Sometime after the September 28 meeting, defendant mailed a copy

---

[1] A call back is an extra charge to the patient for x-ray work done by a technician outside his normal working hours. The charge is part of the patient's bill but the full call-back fee is paid by the hospital to the technician.

of the memorandum to the American Society of Radiological Technologists. On September 29, defendant wrote a letter to the Lay Board alleging that plaintiff had illegally sold x-ray film belonging to the hospital and had kept the proceeds. Since this is perhaps the most serious charge set out in the letters, detailed exposition of the facts is in order. In the fall of 1965, plaintiff approached Dr. Van Sandt, defendant's predecessor, and told him of the lack of storage space for x-ray films. He requested permission to remove some of the old films, sell them, and keep the proceeds as compensation for his extra work. Van Sandt told plaintiff he would approve the plan, if other members of the medical staff approved. Plaintiff approached Dr. Naney and Dr. Hutchins, members of the staff, who gave similar approval. Finally, plaintiff contacted Dr. Foss, chairman of the interim committee operating the hospital, and received his approval.

In January, 1966, plaintiff, working in his off hours, processed and sold 750 pounds of used film to the Silvermat Company and received a check for $157.50.

In his September 29, 1966, letter to the Lay Board, the defendant reiterated his charge that this sale of x-ray film was illegal and included a copy of the check received by plaintiff. Dr. Foss learned later of this charge and wrote a letter dated October 8, 1966, to Mr. Gerber, the administrator, stating that he had given verbal approval to plaintiff to dispose of old, used film in this manner. He further stated that it was inconceivable to him that plaintiff had done anything to warrant dismissal.

Defendant became aware of this letter and wrote a memorandum, dated October 13, 1966, in which he alleged the sale of recent as well as old x-ray film and questioned the authority of Dr. Foss to authorize plaintiff to sell hospital property and keep the proceeds. At trial, however, a portion of this recent film was produced from the records of the radiology department.

After the Lay Board, medical staff and administrator persisted in refusing to dismiss plaintiff, defendant wrote an October 20, 1966, letter to the medical staff and Lay Board in which he restated his previous charges and threatened to resign if plaintiff were not discharged by October 26, 1966.

While there is some dispute about the scope of publication of these letters, it is clear that all four were mailed to and received by the executive secretary of the American Society of Radiological Technologists, the executive director of the American College of Radiology and the executive director of the American Registry of Radiological Technologists. The documents were also mailed to radiologists and hospitals in Fair-

field, Centralia, Olney and Effingham. Plaintiff was informed of his discharge effective November 30, 1966, by Mr. Gerber in a letter dated October 31, in which he stated he was acting upon the recommendation of the defendant.

Plaintiff then applied for the position of x-ray technician at St. Anthony's Hospital in Effingham, but was not employed. Plaintiff was unable to secure satisfactory employment as an x-ray technician and worked at a series of jobs including stock boy in a grocery store, route builder for a tea company, punch press operator, life insurance salesman and store owner.

At the request of the defendant, two special interrogatories were submitted to the jury: "Were the matters set forth in the alleged letters and memoranda substantially true?"; and "Was the defendant, Richard J. Noveroske, guilty of actual malice in publication of the alleged letters and memoranda?" The jury answered the first in the negative and the second in the affirmative. In his post-trial motion the defendant alleged repeatedly and specifically that the evidence did not establish actual malice or the falsity of the allegations. Defendant did not, however, specifically challenge the answers to the special interrogatories by name.

The plaintiff now argues that the post-trial motion was not sufficiently specific to challenge the special interrogatories in order to preserve for appeal the issue that the findings were against the manifest weight of the evidence.

■■ It is well settled that a party is conclusively bound by an answer to a special interrogatory on a material issue unless he moves to set it aside or attacks it in his post-trial motion. (*Huff v. Illinois Central R.R. Co.*, 4 Ill.App.3d 113, 280 N.E.2d 256 (1972); *Quagliano v. Johnson*, 100 Ill.App.2d 444, 241 N.E.2d 187 (1968); *Biggerstaff v. New York, Chicago & St. Louis R.R. Co.*, 13 Ill.App.2d 85, 141 N.E.2d 72 (1957).) While it is clear that a general objection in a post-trial motion that the verdict is contrary to the manifest weight of the evidence is insufficient to preserve for review questions going to the propriety of a special finding (*Voigt v. Anglo-American Provision Co.*, 202 Ill. 462, 66 N.E. 1054 (1903); *Westlund v. Kewanee Public Service Co.*, 11 Ill.App.2d 10, 136 N.E.2d 263 (1956); *Brimie v. Belden Manufacturing Co.*, 287 Ill. 11, 122 N.E. 75 (1919)), there remains some doubt as to the degree of specificity necessary to enable an objection in a post-trial motion to sufficiently challenge special findings of the jury.

In *Scott v. Hernon*, 3 Ill.App.3d 172, 278 N.E.2d 259 (1971), the court required a specific challenge to the special interrogatories to preserve the issue for review. A contrary result was reached in *Midden v. Allstate Insurance Co.*, 7 Ill.App.2d 499, 129 N.E.2d 779 (1955).

In light of these two apparently conflicting appellate court decisions, this court chooses to apply the rationale of the *Midden* case to the case at bar. To hold that the appellant must be more specific would be to place form over substance. There is no magic in a specific reference to the jury's special findings and, as here, where the post-trial motion was couched in the language of the special interrogatories, we hold that the motion was sufficiently specific to put the trial court on notice that the special findings of the jury were being challenged.

The supreme court has recently addressed itself to this problem. In *Wozniak v. Segal*, 56 Ill.2d 457, 308 N.E.2d 611 (1974), the court held that a court is not bound by the failure of a party to specifically challenge a special interrogatory where substantial justice would be denied the movant. While the holding in *Wozniak* is not entirely clear, we read the case to overrule the previous strict pleading requirements as they relate to special interrogatories.

Defendants contend that the rule first enunciated in the now famous *New York Times* case precludes recovery since there was no proof that the letters and memoranda were published with actual malice. *New York Times Co. v. Sullivan*, 376 U.S. 254, 11 L.Ed.2d 686, 84 S.Ct. 710 (1964), held that libelous publications involving public officials are constitutionally protected under the first and fourteenth amendments to the United States Constitution unless published with "actual malice" defined as publication "with knowledge that it was false or with reckless disregard of whether it was false or not."

Defendant further contends that in determining whether defendant uttered the libel with "actual malice," this court in applying the *New York Times* standard must consider and weigh the evidence de novo without affording any presumption or force to the jury's verdict or answer to the special interrogatories and that the scope of appellate review in libel cases is thus different from traditional appellate review where great weight is afforded the verdict as a conclusive determination of disputed factual matters.

Defendant finally contends that the proper application of the *New York Times* rule as it has developed precludes recovery of punitive damages.

Since the matters set forth in the allegedly libelous publications concerned the public health, that is the proper operation of a county hospital which presumably affects the well-being of the citizens of the county, the lower court ruled that the standard set forth in *New York Times* was applicable to the instant action. If the action were against the news media, we would have no doubt about the correctness of this ruling. (*Doctors Convalescent Center, Inc. v. East Shore Newspapers, Inc.*, 104 Ill.App.2d 271, 244 N.E.2d 373 (1968).) However, we have reservations

about the applicability of the *New York Times* rule to defamation actions between private citizens notwithstanding the presence of a matter of legitimate public concern or interest since we perceive the *New York Times* rule and its numerous subsequent refinements to involve the protection of that portion of the first amendment dealing with freedom of the press. The cases, however, do not draw this distinction in explicit terms. In fact, two cases subsequent to *New York Times, Rosenblatt v. Baer,* 383 U.S. 75, 15 L.Ed.2d 597, 86 S.Ct. 669 (1966), and *St. Amant v. Thompson,* 390 U.S. 727, 20 L.Ed.2d 262, 88 S.Ct. 1323 (1968), applied *New York Times* to actions between private individuals, although in both cases the alleged libelous material was broadcast or printed in the news media.

■■■ In any event, the parties here have agreed that the stringent requirement of the *New York Times* rule is applicable. The case was tried before a jury and the instructions framed in accordance with the malice test therein enunciated. In this case the distinction may be meaningless since the defendant, as supervisor of the hospital radiological department, would have had a qualified privilege as to some or all of the libelous material which would be overcome only by a showing of "common-law" malice, that is, evil motive or ill will toward the plaintiff. (*Bloomfield v. Retail Credit Company,* 14 Ill.App.3d 158, 302 N.E.2d 88 (1973).) In fact, the trial court in the instant case ruled that defendant's circulation of the memoranda to the members of the medical staff and the Lay Board was privileged. Thus, we are concerned solely with the circulation of the letters to the professional organizations and other hospitals.

As a threshold question, we must decide the standard to be applied in reviewing the evidence, since defendant states that the evidence at trial fails to show actual malice with "convincing clarity." While the Supreme Court of the United States has imposed upon reviewing courts a duty to examine closely the record to determine "whether it could constitutionally support a judgment" (*Time, Inc. v. Pape,* 401 U.S. 279, 28 L.Ed.2d 45, 91 S.Ct. 633 (1971)), this does not mean that defendant is entitled to a de novo review of trial court proceedings wherein the jury's verdict is entitled to no weight. The balance that must be struck is delicate. On the one hand, "[t]his Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied." (*New York Times Co. v. Sullivan,* 376 U.S. 254, 285, 11 L.Ed.2d 686, 709, 84 S.Ct. 710, 728 (1964).) On the other hand, "[w]here either result finds reasonable support in the record, it is for the jury, not for this Court, to determine whether there was knowing or reckless falsehood."

*Time, Inc. v. Hill,* 385 U.S. 374, 394, 17 L.Ed.2d 456, 470, 87 S.Ct. 534, 545 (1967).

We believe the proper test to be that set out and discussed at length in *Rosenbloom v. Metromedia, Inc.,* 403 U.S. 29, 29 L.Ed.2d 296, 91 S.Ct. 1811 (1971). There the Court held that a libel judgment may be sustained only upon "clear and convincing" proof that the defamatory falsehood was published with knowledge that it was false or with reckless disregard of whether it was false or not.

■ We conclude, therefore, that while it is within the province of the trier of fact to resolve factual disputes, it is the task of the reviewing court to determine whether the principles of the first and fourteenth amendments have been properly applied to those facts. We must make an independent examination of the record to determine whether it could constitutionally support a judgment. This position finds support in *Edwards v. South Carolina,* 372 U.S. 299, 9 L.Ed.2d 697, 83 S.Ct. 680 (1963); *Jacobellis v. Ohio,* 378 U.S. 184, 12 L.Ed.2d 793, 84 S.Ct. 1676 (1964); *Time, Inc. v. Hill; Beckley Newspapers Corp. v. Hanks,* 389 U.S. 81, 19 L.Ed.2d 248, 88 S.Ct. 197 (1967); *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 26 L.Ed.2d 6, 90 S.Ct. 1537 (1970); and *Time, Inc. v. Pape,* 401 U.S. 279, 28 L.Ed.2d 45, 91 S.Ct. 633 (1971).

■■ The rule developed in *New York Times* that the plaintiff must prove that the defamatory statements were made with "actual malice," that is, with knowledge that the statements were false or with reckless disregard of whether they were false or not. The subsequent cases have made it clear that *New York Times* malice must be distinguished from common-law malice, or ill will, hatred, or wanton desire to injure the person defamed. (*Garrison v. Louisiana,* 379 U.S. 64, 13 L.Ed.2d 125, 85 S.Ct. 209 (1964); *Rosenblatt v. Baer,* 383 U.S. 75, 15 L.Ed.2d 597, 86 S.Ct. 669 (1966); *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 26 L.Ed.2d 6, 90 S.Ct. 1537 (1970); *Cantrell v. Forest City Publishing Co.,* 419 U.S. 465, 42 L.Ed.2d 419, 95 S.Ct. 465 (1974).) The *New York Times* rule was further refined in *St. Amant v. Thompson,* 390 U.S. 727, 20 L.Ed.2d 262, 88 S.Ct. 1323 (1968), where it was stated that in applying the "reckless conduct" test, the standard of the reasonably prudent man has no application. "There must be sufficient evidence to permit the conclusion that defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth * * *." (390 U.S. 727, 731, 20 L.Ed.2d 262, 267, 88 S.Ct. 1323, 1325.) Where the material published does not involve an element of "hot news" and the need for expeditious release is not present, the Court has indicated that reckless conduct may be evidenced in part by failure to investigate thoroughly and verify the facts contained therein,

particularly where the material is peculiarly harmful or damaging to the plaintiff's reputation or good name. (*Curtis Publishing Co. v. Butts,* 388 U.S. 130, 18 L.Ed.2d 1094, 87 S.Ct. 1975 (1967); *Goldwater v. Ginzburg,* 414 F.2d 324 (2d Cir. 1969), *cert. denied,* 396 U.S. 1049, 24 L.Ed.2d 695, 90 S.Ct. 701 (1970); *rehearing denied* 397 U.S. 978, 25 L.Ed.2d 274, 90 S.Ct. 1085 (1970).) An examination of relevant Illinois authority reveals that the law of this State is in accord. *Tunnell v. Edwardsville Intelligencer, Inc.,* 43 Ill.2d 239, 252 N.E.2d 538 (1969).

■■ Thus, at a minimum, plaintiff has the burden of establishing that the libelous materials were published in the face of serious doubts as to the truth of the matter asserted or, stated otherwise, without a good faith belief in the truth of the matters published, in order to overcome the protection afforded the published materials by the constitution. Negligence in failing to discover the falsity of the publication or personal ill will toward the plaintiff are insufficient to establish liability. We are mindful that the cases discussed involved publication by the recognized news media. Freedom of the press, as we have indicated, perhaps affords them greater protection, particularly where the urgency to disseminate "hot news" is present. Thus, in a case involving a private plaintiff and defendant, even where a matter of public concern is involved, the protection from liability may not be as broad. We believe the distinction is suggested in the cases previously discussed and in the recent case of *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974). The entire opinion there is framed in relation to the freedom of the press of the recognized news media. However, this theme has not been developed by the cases or by the commentators. The instant case was tried, briefed, and argued before this court under the assumption that the *New York Times* rule in all its aspects is applicable, and we will therefore consider it so. See *Davis v. Schuchat,* 510 F.2d 731 (D.C. Cir. 1975).

On the other hand, this case contains an underlying thread of a qualified privilege arising from defendant's position and duties to the hospital and public. Do these duties to the public present an any less compelling need for first amendment protection than the assumed "chilling effect" or "self-censorship" resulting from strict application of common-law libel principles on a free press? The posture of the case before us does not require us to answer this question.

■■ The Supreme Court of the United States has stated consistently that failure to investigate is not, by itself, evidence of bad faith; however, implicit in this statement is the requirement that there must be some justification for the failure to investigate. For example in *New York Times,* the Court justified the failure of the newspaper to investigate

more fully before publication on the ground that its employee justifiably relied on the good reputation of the sponsors of the allegedly libelous advertisement. Similarly, in *St. Amant,* the Court emphasized that the defendant had known his informant for 8 months prior to the reading of his affidavit and had no reason to doubt his veracity in excusing further investigation.

The discussion in the cases in which actual malice is found to be present centers first upon the defendant's awareness of the seriousness of the allegations made and his consequent responsibility to support them and, secondly, upon the manner in which he discharges this responsibility. In *Curtis* and *Ginzburg,* the courts found that the defendants were clearly aware of the seriousness of their charges. In discussing the adequacy of the support of these charges, each court recognized the highly unreliable nature of the defendants' sources of information and the failure of the defendants to seek corroboration of the information. In *Curtis,* the defendant relied upon uncorroborated information from an informant on probation for bad check charges. In *Ginzburg,* there was reliance upon a poll of questionable validity.

In applying the principles stated above to the instant case, we must first determine if the material published was true or false. The statements involved the accusations that plaintiff charged improper call-backs on several patients; that defendant's predecessor had complained of plaintiff's dishonesty, uncleanliness, and incompetency; that plaintiff displayed uncleanliness by leaving used rectal catheters unwashed and used them on subsequent patients; and that plaintiff had improperly sold x-ray film belonging to the hospital and had kept the proceeds. We have examined carefully the lengthy and conflicting evidence and conclude that sufficient credible evidence exists to support the jury's finding that defendant published allegations concerning plaintiff which were not substantially true. The conflict concerning the propriety of call-backs arose over x-ray work done after plaintiff's normal working hours. Defendant's testimony was that this procedure was improper since the x-rays in question were ordered during normal working hours. Plaintiff's evidence was that the propriety of the extra charge was determined based on the time the x-ray was performed, not when ordered, and that in no instance was work done unnecessarily after normal working hours.

The call-back incidents occurred prior to the time defendant was employed at the hospital. Defendant sought to substantiate the allegations by use of patients' medical records, plaintiff's time sheets and information from Zota Croughan and Shirley Phillips, both of whom worked with plaintiff and were shown to harbor some animosity toward plaintiff. Nothing in the hospital records indicates that these procedures were im-

proper. In fact, the record before us indicates that at no time did defendant contact the hospital administrator to determine what policy, if any, existed at the hospital concerning call-back guidelines.

As to the charge that plaintiff's dishonesty, uncleanliness, and incompetency had been recognized by defendant's predecessor in charge of radiology, who unsuccessfully recommended plaintiff's discharge to the medical staff, the predecessor testified that he visited briefly with the defendant before the latter came to the Clay County Hospital and told him that plaintiff's work could possibly be improved and that he, the predecessor, had had some problem with plaintiff. But his testimony about plaintiff's competence was ambiguous at best and does not appear to support the breadth of defendant's allegation. Apparently, defendant's impression of his predecessor's opinion of plaintiff was largely gathered from remarks made to him by Croughan and Phillips.

Great emphasis was put upon the uncleanliness connected with the failure to clean rectal catheters, which charge was categorically denied by plaintiff. Again, defendant was moved to complain by reports from Croughan and Phillips. In any event, the significance of the practice, whether true or not, was largely deprecated by defendant's own testimony that the practice was not harmful to patients and that he had also employed it, apparently in accord with approved medical technique.

As to the charge of "illegal" sale of used x-ray film, we have noted the abundant testimony that the sale was authorized by the hospital administrator and medical staff and that defendant was aware of this authorization at the time of the publication of two of the allegedly libelous communications.

Therefore, it would appear that the jury was justified in concluding that the allegations made were not substantially true. A more difficult question for consideration is whether the allegations were published by defendant with actual malice as we have defined it above.

Application of the actual malice standard requires that we first find an awareness by the defendant of the potentially harmful effect of the publication upon the plaintiff and the concomitant need for thorough investigation to insure that the publication is true. See *Curtis* and *Ginzburg*.

Here, the defendant definitely was aware of the seriousness of his charges in that he used them as the basis for advocating plaintiff's dismissal. He certainly was aware of the possible harmful effect of these publications upon plaintiff's career when he mailed them to the national professional organizations, where they became part of plaintiff's permanent file, and to area hospitals, where plaintiff was likely to apply for employment. Consequently, we conclude that the jury could find that

defendant was aware of the risk of harm created by these publications and, for the reasons set forth below, recklessly disregarded the risk and published without a good faith belief in the truth of his allegations.

We must now examine more closely the adequacy of the support for the allegations and the thoroughness of the investigation in terms of the utilization of available sources of information and the credibility of the sources used. While failure to investigate standing alone is not evidence of bad faith, it is a very important consideration. *St. Amant.*

As in *Curtis* and *Ginzburg*, there was no urgency for the publication of the documents precluding investigation. Defendant testified that he first became aware of the information which was the basis for his September 8, 1966, memorandum in June, 1966, yet did not say anything to plaintiff about the allegations until September 22. The alleged improper call backs took place before defendant came to the hospital, but still he did not approach plaintiff for an explanation nor discuss the matter with the administrator before publishing his allegations. In addition, he concealed information that would have refuted the charges and made no effort to qualify the allegation or inform those who received the publication of this information.

Defendant testified that he first observed plaintiff leave feces-covered catheters in the sink for 2 to 5 days in June, 1966, yet said nothing to plaintiff about this practice until September 22, because, although "terribly aesthetically disturbing," this practice did not harm the patient. Despite this knowledge, defendant described this conduct as a "character defect" and admitted at trial that while he could have stopped the practice at any time, he let it continue to provide a "punch" to effect plaintiff's dismissal. With respect to the sale of x-ray film, defendant knew of the removal of the film from the department in the summer of 1966, but said nothing to plaintiff about it until September 28. A most cursory investigation before this time would have revealed the authorization given by the administrator for the sale. Defendant did learn of the authorization prior to the publication of the October 13 and October 20 memoranda, yet still characterized the sale as "illegal," thus transforming his characterization of what may have been a questionable judgment by the administrator into an "illegal" act by the plaintiff.

In each of these instances a more thorough investigation would have prompted the deletion from or qualification of the allegation in the publications. In fact, the failure of defendant to conduct an investigation from June to September suggests a permissible inference that defendant deliberately failed to seek verification.

The allegations set out in these publications were primarily the personal opinions of the defendant as to the propriety of plaintiff's conduct. Yet

these publications were written so to suggest that defendant's opinions were shared by others. The use of terms like "illegal" and "dishonest" call backs and "illegal" sale of x-ray film implies that these are conclusions which had been reached by the hospital staff or administrator.

Clearly there is sufficient evidence that defendant was motivated by common-law malice, that is, ill will, evil motive, intention to injure without just cause, and wanton disregard of plaintiff's rights. (*Cook v. East Shore Newspapers, Inc.*, 327 Ill.App. 559, 64 N.E.2d 751 (1945); *Lorillard v. Field Enterprises, Inc.*, 65 Ill.App.2d 65, 213 N.E.2d 1 (1965); *Bloomfield v. Retail Credit Co.*, 14 Ill.App.3d 158, 302 N.E.2d 88 (1973)). Common-law malice is not the same as *New York Times* malice; however, defendant's attitude toward plaintiff certainly affected the preparation and dissemination of his allegations. Defendant admitted that, beginning in June, 1966, he wanted plaintiff dismissed and let continue practices which he could have halted in order to obtain this end. As in *Ginzburg*, it appears that the personal ill will of the defendant toward the plaintiff caused him to disregard the most rudimentary precautions before publishing the documents.

■■ Finally, we must examine the adequacy of the defendant's justifications for the publication of these documents. Defendant claimed that his overriding concern in mailing the letters to the area radiologists and hospitals and to the national professional organizations was to protect his patients. However, his patients were not likely to be patients at these hospitals nor did he allege in the publications that plaintiff engaged in any practice that was medically harmful. As a second justification for his actions, defendant alleged that the plaintiff asked him to send these letters to the national organizations. Defendant bases this claim on an alleged conversation with plaintiff in which plaintiff stated that any technician faced with charges of incompetence is entitled to a full investigation by the professional organizations. Plaintiff denied that he ever said this, and even if he had, the mailing of these letters was not in accordance with plaintiff's wishes because there was no request for investigation, only conclusions of illegal conduct. For these reasons, we reject defendant's argument that the wide distribution of these letters was justifiable and in good faith.

■■ In conclusion, we find that defendant's failure to investigate despite ample time to do so, his reliance on clearly biased sources, his deliberate concealment of information, and his obvious desire to have plaintiff dismissed from the Clay County Hospital constitutes sufficient evidence to sustain the jury's finding that the publications were made with "actual malice."

■■ The defendant further argues that an award of punitive damages

is precluded by the first amendment in libel actions governed by the *New York Times* rule. This argument has been consistently advanced and just as consistently rejected by the Supreme Court of the United States. (*Curtis Publishing Co. v. Butts*, 388 U.S. 130, 159, 18 L.Ed.2d 1094, 87 S.Ct. 1975, 1994 (1967).) In *Curtis*, the Court stated that evidence sufficient to justify an award of compensatory damages under the proper application of the *New York Times* rule also justifies an award of punitive damages so long as the award is not demonstrated to be founded upon mere prejudice of the jury. (See also *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 29 L.Ed.2d 296, 91 S.Ct. 1811 (1971).) It is notable that the position espoused by the defendant here has long been argued by Mr. Justice Marshall and Mr. Justice Stewart, but has never been accepted by a majority or plurality of the Court.

While the recent decision of *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 41 L.Ed.2d 789, 94 S.Ct. 2997 (1974), will have wide-ranging impact on the law of defamation of private plaintiffs and their inability to recover punitive damages under a negligence standard, we do not read the decision as retreating from the Court's previous holdings that punitive damages are properly recoverable under the actual malice test of *New York Times*. The instant case was tried under the *New York Times* rule and we find nothing in the punitive damage award here that would indicate whim or prejudice on the part of the jury in its determination of the size of the award.

So far as first amendment rights are concerned, a plaintiff who satisfies the *New York Times* rule may recover punitive damages; however, this is not to say that the States may not impose greater or additional tests as a condition to the recovery of punitive damages. (*Cantrell v. Forest Publishing Co.*, 419 U.S. 465, 42 L.Ed.2d 419, 95 S.Ct. 465 (1974); *Davis v. Schuchat*, 510 F.2d 731 (D.C. Cir. 1975); see also *Buckley v. Littell*, ―― F.Supp. ―― (S.D.N.Y. 1975).) Common-law malice focuses upon defendant's attitude toward the person defamed while actual malice under *New York Times* focuses upon defendant's attitude toward the truth or falsity of the matters asserted and bears no relation to his personal ill will or rancor toward the plaintiff.

However, our analysis of the Illinois decisions leads us to conclude that evidence sufficient to satisfy "actual malice" under *New York Times* is sufficient to satisfy Illinois common-law malice.

While Illinois courts have not had occasion to consider the distinction subsequent to the development of the "actual malice" test of *New York Times*, we believe that conduct sufficiently reckless to satisfy *New York Times* evidences ill will and wanton disregard of the effect of the libel upon the plaintiff and satisfies common-law malice requirements which

will sustain an award of punitive damages. *Bloomfield v. Retail Credit Co.,* 14 Ill.App.3d 158, 302 N.E.2d 88 (1973), states that "actual malice" does not require evidence of spite or hatred toward plaintiff, but may be shown to exist "by publishing material without a reasonable basis for belief in its truth." It appears to us that the court in *Bloomfield* equated actual malice and common-law malice. (*Cf. Myers v. Spohnholtz,* 11 Ill. App.3d 560, 297 N.E.2d 183 (1973).) We see nothing in *Tunnell v. Edwardsville Intelligencer, Inc.,* 43 Ill.2d 239, 252 N.E.2d 538 (1969), to the contrary, that case involving simply the failure to prove New York Times actual malice. In any event, the evidence in the instant case was ample to show that defendant was in fact motivated by ill will toward plaintiff.

■■ We are somewhat persuaded by the position consistently espoused by Mr. Justice Marshall and Mr. Justice Stewart in *Curtis* and *Rosenbloom,* and by the rationale of the holding in *Maheu v. Hughes Tool Co.,* 384 F.Supp. 166 (C.D. Cal. 1974). However, we believe the state of the law as expressed by both the Supreme Court of the United States and the Supreme Court of Illinois sanctions the award of punitive damages in the instant case.

■■ Defendant also has assigned as error the court's rulings on the admission of certain evidence at trial and the conduct of counsel in questioning defendant contrary to an *in limine* order proscribing inquiry into defendant's presence or treatment during 1964 at a psychiatric hospital.

The following occurred:

"Q. Then you left and entered Harding Hospital in Columbus, Ohio? [Objection overruled]

Q. You went to Harding Hospital didn't you sir?

A. Yes.

Q. You were there how long? [Objection overruled]

A. About five months.

Q. And at that time you didn't perform any radiology services while in the hospital at Harding?

A. That's true."

Similar questioning occurred later in the trial. The court denied defendant's motion for mistrial, observing that there was no indication that Harding Hospital was a psychiatric hospital or that defendant was a patient there, only that he did not perform radiological services while there. The question occurred during examination concerning defendant's educational and professional background. It did not suggest that Harding Hospital was a psychiatric institution or that defendant was there other

than as a physician. We agree with the trial court that the questioning was not in violation of its order.

Complaint is also made that the same order was violated by plaintiff's inquiry into the circumstances surrounding defendant's discharge from Deaconess Hospital at Indiana University Medical Center. Plaintiff inquired whether 35 doctors there had requested that defendant be relieved of his duties. Defendant had testified on deposition that he left Deaconess because of his mental illness and marital difficulties. While objection to this questioning was sustained, defendant argues that to allow inquiry into the cause of his departure required him to state these reasons and that this questioning alone violated the *in limine* order. Plaintiff's offer of proof was that he was entitled to show defendant's incompetency as a radiologist as it would be relevant to defendant's opinion of plaintiff's competency as a technician.

■■ We believe that the *in limine* order excluded only the fact of defendant's mental illness and treatment therefor. Plaintiff's question did not remotely suggest this, but was directed properly or improperly to defendant's competency. Even if we would agree that the question was improper, the objection was promptly sustained and we fail to perceive any prejudice to the defendant. We have reviewed the cases cited by defendant and find them distinguishable upon their facts.

We have examined other remarks of counsel made in response to an offer of certain exhibits in evidence, which, in fact, were admitted. We find no prejudicial error in the remarks. We would again state that in a trial of this length and complexity, we must be mindful of the fact that no trial is free of error; however, we are satisfied that no error occurred to the prejudice of defendant which affected the outcome.

■■ At trial, evidence of defendant's net worth and net income was admitted by stipulation. Although defendant agreed to the stipulation as to net worth, he strenuously objected to the admission of net income. The court, however, informed the jury of net income as a "stipulation." Defendant now urges that evidence of his net earnings was inadmissible and constituted prejudicial error in that the evidence in question may have given the jury an impression of wealth, resulting in an excessive award of actual and exemplary damages. In support of his position, defendant cites *Chicago Daily News Employes' Credit Union v. Reed,* 42 Ill.App.2d 336, 192 N.E.2d 447 (1963), as authority for the proposition that evidence relating to a party's wealth or poverty is inadmissible. However, that case involved the determination of compensatory rather than punitive damages. We agree with the defendant that when compensatory damages are in issue, evidence of a party's wealth is clearly inadmissible.

*Hedge v. Midwest Contractors Equipment Co.,* 53 Ill.App.2d 365, 202 N.E.2d 869 (1964).

To the contrary, however, the law in Illinois clearly allows evidence of the defendant's net worth and pecuniary position in cases in which punitive damages are proper. (*Moore v. Jewel Tea Co.,* 116 Ill.App.2d 109, 253 N.E.2d 636 (1969); *Chapin v. Tampoorlos,* 325 Ill.App. 219, 59 N.E.2d 334 (1945); *Hinton v. Muhlman,* 201 Ill.App. 177; 22 Am. Jur. 2d *Damages* § 320 (1965); 25 C.J.S. *Damages* § 125(3) (1966).) A civil case involving malice, such as the one before the court, may be a proper instance for a jury award of exemplary damages.

Theoretically, punitive damages serves two basic functions, "to punish for a past event and to prevent future offenses, and the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of the guilty person." Restatement of Torts, ch. 47, § 908, comment e at 557 (1939).

The goal thus being to apprise the jury of the information needed to assess an award which would adequately "punish" the defendant, the issue is whether evidence as to net earnings may be a proper gauge to determine "wealth." Traditionally, courts have used net worth to measure the defendant's wealth, "net worth" defined as "the aggregate of the equities representing proprietary interests; the excess of the going-concern value of assets over liabilities to outsiders" (Kohler, A Dictionary for Accountants 332 (3rd ed.)), or very simply, "[r]emainder after deduction of liabilities from assets" (Black's Law Dictionary 1192 (4th ed. 1951)).

Since the objective of admitting evidence as to defendant's wealth is to give the jury a true idea of defendant's ability to pay a punitive judgment, we believe that further evidence as to net earnings would be of little probative value. In the first place, defendant's past earnings are necessarily and inextricably intertwined with his net worth. This is particularly true in the instant case where the evidence showed that some of defendant's "assets" were purchased from income. Thus, a real possibility exists of providing the jury a deceptively high ability to pay. Nor would net earnings be admissible to show defendant's future ability to pay the judgment. Neither this court nor a jury may assume that because a defendant has earned a certain amount in past years that he will continue to earn that amount or any amount. It would be impossible to guarantee or even speculate that a defendant would earn in future years the amount relied upon by the jury to fix punitive damages. And to force the defendant to maintain a certain position and income in the future to pay a present punitive damage award would be unwarranted. We hold, therefore, that evidence of net earnings was inadmissible to determine punitive damages.

We note that, although there is no Illinois law on this matter, other jurisdictions have not accepted this approach. In *Jones v. Fisher*, 42 Wis. 2d 209, 221, 166 N.W.2d 175, 181 (1969), the court stated:

"Net worth may not in all instances be the best measure of an individual's ability to respond in damages. We believe a more accurate gauge is his financial resources, which include his earnings as well as his net worth. In some instances it may work to the defendant's advantage to show his net earnings."

Similarly, in *International Union of Operating Engineers, Local No. 675 v. Lassitter*, 295 So.2d 634 (Fla. App. 1974), the court found that the establishment of a net worth figure was a minimum requirement to support an award of punitive damages, but addressed itself to the difficulties, under some circumstances, of limiting evidence of defendant's financial resources to "net worth." In attempting to determine the scope of the term "financial resources," admittedly a broader term than "net worth" which is the standard of measurement under Illinois case law, the court noted:

"As stated, it is the broader concept and, depending upon the circumstances, there may well be additional proofs which would be helpful to the jury and court; which proofs would not be necessarily included in a defendant's balance sheet. * * * For instance, there could well be, and properly so, proof as to income, cash flow, expenses, anticipated income, diminutions of income * * * [and] all such other evidence as he [plaintiff] may wish as will reflect the defendant's financial resources may be received in evidence and considered by the jury." 295 So.2d 634, 644-645.

We believe, however, that the various courts' reliance on particular circumstances points up the impropriety of applying this rationale in the instant case. We are not faced with a situation in which the defendant's assets are in some way indeterminable or concealed. Our approach is the only sound way to balance the need to punish a defendant with the need to avoid imposing an oppressive burden upon him.

■■ While we recognize the error of the trial court, however, we do not believe that such error requires reversal in the instant case. The award of punitive damages here is not so disproportionate to the properly shown net worth of the defendant to indicate that the jury relied independently upon the evidence of net earnings or that the jury was in any way deceived as to defendant's ability to pay the judgment.

Additionally, defendant assigns as error the trial court's refusal to admit into evidence purported admissions of plaintiff contained in a partial memorandum of notes taken by plaintiff's attorney's secretary at the September 28, 1966, meeting of the Lay Board of Clay County Hos-

pital. The notes are sketchy and incomplete, and contain gaps which render many of the statements unintelligible. During the cross-examination of plaintiff, defense counsel attempted to present the notes but the trial court sustained plaintiff's objection that the notes had not been properly authenticated. However, while the notes were not admitted, the trial court eventually allowed defense counsel, over plaintiff's objections, to question plaintiff in regard to two specific remarks he made before the Board. Defendant contends here that it was error for the court to exclude any part of the notes. We also note that the substance of what transpired at this meeting and what plaintiff had said was testified to by Arthur Hough, vice chairman of the Lay Board.

■■ Defendant has outlined at least four specific portions of the notes of the Lay Board meeting wherein alleged admissions occurred. Before discussing the merits of these individual points it is best to point out that in order to be admissible, admissions against interest, like other evidence, must be relevant to the issues. (*Maltby v. Chicago Great Western Ry. Co.*, 347 Ill.App. 441, 106 N.E.2d 879 (1952).) Defendant argues that, at trial, plaintiff testified that the only change made by his temporary replacement at the hospital was the painting of a goose-neck lamp and a view box. Yet it is argued that before the Lay Board, plaintiff stated, "I came back here and found everything had been changed. Things had been painted, moved." We fail to see how such a minute distinction affects any material issue. Such a remark has questionable value for impeachment purposes and is devoid of substantive worth as an admission.

■■ Additional purported admissions occurred concerning plaintiff's sale of x-ray film. From what we are able to tell, defendant appears to argue that plaintiff's failure to mention any authorization to sell film from Dr. Foss before the Lay Board amounted to an admission by silence. If this is the substance of his claim, defendant misapprehends the applicable principle. "If a statement is made by another person in the presence of a party to the action, containing assertions of fact which, if untrue, the party would under all the circumstances naturally be expected to deny, his failure to speak has traditionally been receivable against him as an admission." (McCormick on Evidence § 270 (2d ed. Cleary 1972); 4 Wigmore, Evidence § 1071 (3d ed. 1940); see also *Dill v. Widman*, 413 Ill. 448, 109 N.E.2d 765 (1952).) But we are not confronted here with a mute reaction to an accusation. Rather, the plaintiff was explaining the scope of his authority to remove and sell film when he apparently omitted reference to Dr. Foss. This omission does not tell us specifically that Dr. Foss was ever consulted, particularly in view of the ambiguous and incomplete nature of the notes.

■■ We find defendant's remaining allegations of error in refusing to admit defendant's Exhibit 33 equally unpersuasive. In any event, we cannot say exclusion of the notes was reversible error because the admission of the notes into evidence would not have justified a different finding by the trial court. (*Steiner v. Rig-A-Jig Toy Co.*, 10 Ill.App.2d 410, 135 N.E.2d 166 (1956).) Such admission merely would have affected plaintiff's credibility on relatively insignificant points. In reaching this conclusion, we note again that perhaps the most damaging segments of the notes were, in fact, used to impeach the testimony of plaintiff.

For the foregoing reasons, the judgment of the Circuit Court of Clay County is affirmed.

Affirmed.

EBERSPACHER and G. MORAN, JJ., concur.